IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA

Case No: 1:21-cv-00012

| | | |
|---|---|---|
| Brandy Suckley, Reannan Suckley, Natasha Calderon, Shoghi Farr, Blake Ish, Jyl Albertson, Mathew Baumstark, Danika Owan, Doc Ritchie, Lynette Cole-Perea, Manuel Perea, Emily Holly, and Bryan Fleming, | ) ) ) ) ) ) | **DEFENDANT, CITY OF WILLISTON'S, MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT** |
| Plaintiffs, | ) ) | |
| vs. | ) ) | |
| The City of Williston, North Dakota, | ) ) | |
| Defendant. | ) | |

\*\*\*               \*\*\*               \*\*\*

## I.   INTRODUCTION

The City of Williston enacted an ordinance prohibiting the possession of pit bull dogs within city limits in 1987. This ordinance remains in effect pursuant to the City's plenary powers to protect and safeguard the safety, health, and welfare of its inhabitants.  This public safety law infringes upon no fundamental rights.  It is undisputed a reasonably conceivable state of facts exist to establish the ordinance furthers a legitimate government interest.  Further, the City's ordinance mirrors those which have withstood judicial scrutiny.  Lastly, individuals charged with violating the pit bull ordinance are afforded the same legal process as any criminal defendant in the State. This includes the right to a jury trial and appeal to the North Dakota Supreme Court.  The City is entitled to summary judgment with respect to all claims raised in the Plaintiffs' Complaint.

## II.   STATEMENT OF FACTS

The Plaintiffs seek judicial review of the City's long-standing prohibition on possession of

Pit Bull dogs within the City's limits.  To the extent substantive due process and equal protection apply[1], this ordinance is subject to a rational basis standard of review which is "not subject to courtroom fact-finding" or "legislative facts." F.C.C. v. Beach Communications, Inc., 508 U.S. 307, 315 (1993).  While the City's "legislative choice may be based on rational speculation unsupported by evidence or empirical data,"[2] the City will provide context to this litigation and explain how the ordinance came to be, why it remains vital to further the health, safety, and welfare of its citizens, how it is enforced, and the numerous studies that support its position.  A brief explanation of the facts as relevant to each remaining named Plaintiff will also be provided to understand the context of this litigation.

A.     **The City's power to enact ordinances to protect safety, health, and welfare.**

Williston is a municipal corporation organized under the laws of North Dakota.  H.R.C. Art. 1.[3]  Under North Dakota law, Williston has the power to adopt, amend, and repeal "ordinances, resolutions, and regulations to carry out its governmental and propriety powers and to provide for public health, safety, morals, and welfare, and penalties for a violation thereof."  N.D.C.C. § 40-05.1-06(10).  Further, Williston has the power to "provide for city courts, their jurisdiction and powers over ordinance violations…."  N.D.C.C. § 40-05.1-06(8).  In accordance with these vested powers, Williston enacted a Home Rule Charter which provides the following:

> The governing body[4] shall have plenary power to enact and make all proper and necessary ordinances…and thereby protect and safeguard the rights, interests, safety, morality, health and welfare of the city and its inhabitants.

---

[1] The City does not concede substantive due process or equal protection apply to this case.  See footnote 28 on page 24 of this memorandum.

[2] Id.

[3] "H.R.C." refers to the City of Williston's Home Rule Charter.  A copy of the H.R.C. is found at https://ecode360.com/36615807.

[4] Williston operates under the commission system of government as provided in N.D.C.C. Ch. 40-04 and 40-15.

H.R.C. Art. 6.

Pursuant to its plenary power, the City enacted the "Code of Ordinances, City of Williston" ("City Code") to protect and safeguard the rights, interests, safety, morality, health, and welfare of the City and its inhabitants.  See City Code Ch. 1-25[5].

**B.     Possession of pit bulls has been prohibited since March 1, 1987.**

On February 17, 1987, The City Commission published Ordinance No. 687 which made it illegal to possess any pit bull dog within the City's limits effective March 1, 1987.  Doc. 28-1.[6] This ordinance was the product of a community push to ban the possession of pit bull dogs within the City's limits to protect the health, safety, and welfare of the people within the City's jurisdiction.  Piesik Aff'd at ¶ 3.

On March 1, 1987, Ordinance 687 became effective and provides the following:

Section 1. Purpose: In order to protect the health, safety and welfare of the residents and citizens of the City of Williston, the Board of City Commissioners of the City of Williston does hereby enact the following provisions:

Section 2. Pit Bull Dogs: Keeping prohibited. It shall be unlawful to keep, harbor, own or in any way possess within the corporate limits of the City of Williston, North Dakota, Any (sic) pit bull dog; provided, that pit bull dogs registered with the City on or before the first day of March, 1987 may be kept within the City subject to the standards and requirements set forth in Section 2-3 of this Article. "Pit bull dog" is defined to mean:
(a) the bull terrier breed of dog;
(b) Staffordshire bull terrier breed of dog;
(c) The American pit bull terrier breed of dog;
(d) The American Staffordshire terrier breed of dog;
(e) Dogs of mixed breed or or of other breeds than above listed which breed or mixed breed is known as pit bulls, pit bull dogs or pit bull terriers;

---

[5] The City Code can be viewed in its entirety at https://ecode360.com/WI4120.

[6] The City Commission received public comment about Ordinance No. 687 at its February 24, 1987, meeting.  Olson Aff'd at ¶ 52, Exhibit # 33 at p. 9.  One member of the public believed the ordinance was "unfair as it singles out one breed of dog."  Id. at p. 9.  The County Sheriff "reported an incident involving two pit bull dogs that persistently attacked a lady and the officials trying to help her."  Id.  Further, the Chief of Police discussed an article where "three pit bull dogs killed a four-year old child."  Id.

(f) Any dog which has the appearance and characteristics of being predominently (sic) of the breeds of bull terrier, Staffordshire bull terrier, American pit bull terrier, American Staffordshire terrier, any other breed commonly known as pit bulls, pit bull dogs or pit bull terriers, or a combination of any of these breeds.

Doc. 28-1 at p. 1.

Section 2 of Ordinance 687 is codified as Ch. 4 Art. VI, § 4-89 of the City Code. Compare Doc. 27-6 at p. 1; Doc. 28-1 at p. 1. It has remained unchanged since its approval in 1987.[7]

Section 2-3 of Ordinance 687 provided an exception for any individuals who owned a registered pit bull prior to March 1, 1987. Doc. 28-1 at p. 1. This exception is codified as Ch. 4 Art. VI, § 4-90. Compare Doc. 27-6 at p. 1; Doc. 28-1 at p. 1. This exception evolved over time. Aff'd of Taylor Olson at ¶¶ 53-57. On February 26, 2019, Williston approved Ordinance No. 1100 which amended the exception to provide in part that "the provisions of this article are not applicable to owners, keepers or harborers of pit bull dogs registered with the City of Williston, who qualify as having a disability or require an animal pursuant to the Americans with Disability Act or federal or state fair housing laws…." Olson Aff'd at ¶¶ 53-56; Exhibit #'s 34-36. While the exceptions to § 4-89 evolved over time as § 4-90 was amended in both 2017 and 2019, the general prohibition on harboring pit bulls has been the law of Williston since March 1, 1987. Doc. 28-1 at p. 1; Doc. 27-6 at p. 1.

C.    Why Williston Bans Pit Bulls

The originally stated purpose of Ordinance 687 – "to protect the health, safety and welfare of the residents and citizens" remains the purpose of the § 4-89 today. Piesik Aff'd at ¶4; Cymbaluk Aff'd at ¶ 10; Klug Aff'd at ¶ 8; Bekkedahl Aff'd at ¶ 11. The prohibition on pit bulls

---

[7] The typos noted above were fixed when Section 2 of Ordinance 687 was enacted into City Code as § 4-89. Otherwise, the text of § 4-89 is identical to Section 2 of Ordinance 687 as to when it was approved on February 4, 1987. Compare Doc. 28-1 at p. 1; Doc. 27-6 at p. 1.

has been well-supported by the community and the City Commission strongly believes the long-standing ordinance is in the best interests of the citizens of Williston.  Piesik Aff'd at ¶4; Cymbaluk Aff'd at ¶¶ 5,10; Klug Aff'd at ¶¶ 11-12; Bekkedahl Aff'd at ¶ 11.  While there have been numerous incidents where people failed to follow the City's prohibition on pit bull possession, the importance of § 4-89 was exemplified by a vicious pit bull attack at an elementary school playground in July 2019.  Piesik Aff'd at ¶ 5; Cymbaluk Aff'd at ¶¶ 6-10; Klug Aff'd at ¶ 8; Bekkedahl Aff'd at ¶ 5.

      1.     Rickard Elementary School Playground Pit Bull Attack

On July 1, 2019, a nanny and children were attacked by a group of pit bull dogs at Rickard Elementary School playground in Williston.  Olson Aff'd at ¶ 47; Exhibit # 30.  The pit bulls escaped from a nearby house and entered the playground where they initiated the attack.  Id. at pp. 4-5.  Upon hearing screaming, a neighbor ran toward the school and observed the dogs attacking the nanny and children.  Id. at p. 3.  The nanny attempted to pull the dogs off the children, and was viciously bitten in her face, ear and arm.  Id. at pp. 4, 28-37.  The neighbor arrived and grabbed the little boy and girl and attempted to kick the dogs off.  Id. at p. 45.  Eventually, others came over to help and the dog owner eventually retrieved the dogs.  Id.  Unfortunately, the children and neighbor also sustained injuries from the attack.  Id. at pp. 25-26, 27, 38-44. As a result of the attack, the pit bull owner was charged with and pled guilty to violation of § 4-89 among other charges.  Olson Aff'd at ¶ 49; Exhibit # 31.

This incident received substantial media attention.  Cymbaluk Aff'd at ¶ 6; Exhibit #'s 1-3.  It also resulted in backlash against City officials for the pit bulls even being in the City. Cymbaluk Aff'd at ¶ 8; Exhibit # 4.  As one enraged individual stated: "Williston has pit bull laws. WHY ARE THERE STILL PITBULLS OBVIOUSLY IN WILLISTON??...It is sickening that the attacks had to occur before the laws are enforced…Please do your duty and PROTECT the citizens

of Williston from ever having to endure this horror again." Id.

This attack provided further evidence that the City's prohibition on pit bulls was indeed necessary to protect the health, safety, and welfare of the City and its citizens. Piesik Aff'd at ¶ 5; Cymbaluk Aff'd at ¶¶ 6-10; Klug Aff'd at ¶ 8; Bekkedahl Aff'd at ¶ 5. As Howard Klug, president of the City Commission, simply stated, "I do not want the citizens of our community walking around our City in fear of being attacked by a Pit bull dog." Klug Aff'd at ¶ 9. The Rickard Elementary Playground incident is illustrative as to the exact scenario § 4-89 is enacted to prevent. Klug Aff'd at ¶ 6; Piesik Aff'd at ¶ 5; Cymbaluk Aff'd at ¶ 10; Bekkedahl Aff'd at ¶ 5. This rationale is well-founded in numerous studies from across the country over the decades as explained in the next section below:

**D.      The studies on Pit Bulls as a dangerous breed**

Whether Pit bulls pose an increased risk to the public - especially children - has been the subject of substantial studies. Evidence that pit bulls cause a health and safety risk to the general public is not just confined to the opinions of the City's experts, but also explained in many studies attached to this motion. The supporting evidence is quite voluminous; therefore, this section will focus on the City's expert opinions and a brief overview of the main points of the various attached studies.

1.      Dr. Golinko's Opinion

Dr. Michael Golinko is a pediatric craniofacial plastic surgeon at Vanderbilt University Medical Center who frequently treats injuries that stem from dog bite injuries. Golinko Aff'd; Exhibit # 2 at p. 1. Specifically, he is the Chief of Pediatric Plastic Surgery at the Vanderbilt University Medical Center. Id. Early in his career he noticed a pattern that there was a "preponderance, especially in the more severe injuries, that 'pit-bull or pit-mix' was mentioned.

More often than not, the dog was known to the family and not a stray." Id.  As a result of these reports, he set out to study dog bites injuries.  Id.  Dr. Golinko was involved in authoring two studies that evaluated the correlation between pit bull bites and ER visits.  Each study will be briefly explained below:

           i.       *Atlanta Experience: Characteristics of 1616 Consecutive Dog Bits at a Single Institution.*

This retrospective, peer reviewed report was published in *Clinical Pediatrics* 2017 Vol 56(4).  Id at pp. 2-3.  Dr. Golinko found the data from this study compelling as it showed that an examination of "just the most severe injuries (i.e., the 89 patients that underwent surgery), nearly 70% involved the head and neck region and 50% involved pit bull breeds.  There was over a **three times greater risk in the injury being treated in the operating room** (OR) (as a proxy for severity of injury) **when a pit bull was identified as the biting dog**." Id. at p. 3 (emphasis added).  Dr. Golinko further explained the study showed that "Pit bull breeds were also more than 2.5 times as likely to bite in multiple anatomic locations." Id. at p. 3.

           ii.      *Arkansas Experience: Characteristics of Dog Bites in Arkansas.*

This was a companion study to the "Atlanta Experience" in which Dr. Golinko co-authored and was published in the South Medical Journal in August of 2018.  Id.  During the course of this study, Dr. Golinko found that "pit bull-injuries were over 3-times as likely to be associated with" severe injuries warranting operating room interventions.  Id.  Further, in the adult bites where breeds were identified, "pit bulls represented 64.7% of the sample." Id.

           iii.     *Dr. Golinko's concluding opinion*

Dr. Golinko opined that his personal experience as an emergency room surgeon and the studies in which he participated "coupled with the overwhelming preponderance of published literature from everywhere in the world – both rural and urban settings alike – citing pit bull

injuries causing more morbidity and mortality than other breeds, points to a strong argument for

adequate government protection for the public." Id.  He further concluded as follows:

> As a pediatric plastic surgeon who treats the most severe injuries in children, a dog-owner and a parent myself, the whole of my experience and interpretation of the available literature that a pitbull or pitbull breed having a "bad day" and injuring a person is on average [ ] worse than a chihuahua having a "bad day."…one can not ignore the spectrum of injury from a simple nip or scratch to biting an ear or a hand off which I have personally treated.  As for the myriad [of] breeds available to the potential dog owner, it seems to me the potential risk of owning a pitbull is not worth the benefit – especially when hearing and seeing the severe injuries I have personally treated and the anguish it causes the families members of in many cases permanent disfigurement and disability.

Id. at p. 4.

2.      Ron Berman's Expert Opinion

Berman has "over 43 years of experience as a canine behavioral consultant and dog

trainer."  Berman Aff'd at ¶ 3, Exhibit # 2 at p. 1.  He is a published author in "canine behavior

including canine aggression, training and the investigation of dog attacks" as well as the "co-

author of a peer reviewed article regarding the identification and analysis of canine bite wounds."

Id.  Berman has "personally trained over 12,000 dogs and their owners," has testified at trial on

87 occasions and has "been qualified as an expert in every court" in which he has appeared.  Id.

at pp. 1-2.

Berman's report is lengthy and highlights numerous studies which show pit bulls bite more

often and inflict more serious wounds than other breeds.  Id. at *passim*.  Further, the findings of

these numerous studies are consistent with his experience.  Id. at pp. 16-17.  Additionally, Berman

evaluated the breed identification process implemented by the City and concluded it is  "state of

the art and therefore as reliable as currently possible."  Id. at p. 15.  The main points of Berman's

reports are explained before:

> ### i.   *Pit bulls are more dangerous than other breeds.*

Berman's report highlights the City's prohibition on pit bulls is supported by a plethora of both scientific studies and real-life evidence.  Berman relies on numerous studies dating from 2008 to 2020 in support of his opinions that "Pitbulls have been shown in scientific literature to bite more often than other breeds" and that pit bulls "have consistently been identified as inflicting more severe wounds, when they do attack, than other breeds."  Id. at pp. 5-7.  The studies upon which Berman relied in his report are attached to his affidavit; however, key highlights from studies published between 2008 and 2020 as cited in Berman's report are found below:

- 2008: Finding 60% of fatal dog bite injuries over a 20-year period involved pit bull type dogs, rottweilers, and German shepherds[8].  Berman Aff'd at Exhibit # 2 at p. 76.
- 2009: A five-year study found that 50.9% of injuries treated in the emergency department at the Children's Hospital of Philadelphia were caused by pit bull terriers.[9]  Berman Aff'd at Exhibit # 2 at p. 89.
- 2014: A 74-month study at a level one pediatric trauma center found that 39% of traumatic injuries where dog bites were documented were attributed to pit bulls and "Pit bulls were most frequently responsible" for dog bite injuries requiring operative intervention.[10]  Berman Aff'd at Exhibit # 2 at p. 102.
- 2018: Two different studies showed that Pit bulls bit far more frequently than other breeds.[11,12]  Berman Aff'd, Exhibit # 2 at p. 142, 145.  Specifically, "Pit bull attacks have been found to also account for higher morbidity rates, higher hospital charges, and a higher risk of death than attacks from other dog breeds

---

[8] Tsokos, M., Byard, R., Püschel, K., 2007 'Extensive and Mutilating Craniofacial Trauma Involving Defleshing and Decapitation' *American Journal of Forensic Medicine and Pathology*, Vol. 28, No. 2 at p. 133.

[9] Kaye, A., Belz, J., Kirschner, R., 2009 'Pediatric dog bite injuries: a 5-year review of the experience at the Children's Hospital of Philadelphia' *Plastic Reconstructive Surgery*, Aug;124(2):551-558. doi: 10.1097/PRS.0b013e3181addad9.

[10] Garvey, E., Twitchell, D., Ragar, R., Egan, J, Jamshidi R. 2015 'Morbidity of pediatric dog bites: a case series at a level one pediatric trauma center' *Journal of Pediatric Surgery*, Feb;50(2):343-6. doi: 10.1016/j.jpedsurg.2014.09.051. Epub 2014 Dec 26.

[11] Brice, J., Lindvall, E., Hoekzema, N., Husak, L., et al. 2018 'Dogs and Orthopedic Injuries: Is There a Correlation With Breed?' *Journal of Orthopedic Trauma*, Sep;32(9):e372-e375. doi: 10.1097/BOT.0000000000001235.

[12] Tang, J., Arneja, J. 2018, 'Are Dog Bites a Problem of Nature or Nurture?' *Plastic Surgery,* Nov; 26(4): 297-298. Epub 2018 Oct. 3.

in addition to a higher proportion of fatal injuries reported in the United States."[13]  Berman Aff'd, Exhibit # 2 at p. 144.

- 2019: A study published in the Journal of Pediatric Surgery concluded that Pit bulls were the most identified breed at 36.2% of all dogs who inflicted dog bite injuries on patients. [14]  Berman Aff'd, Exhibit # 2 at p. 148.

- 2020: A study published in the Journal of Veterinary Behavior found that based on a study of national and local news articles beginning in September 2016, the most reported attacking breed was the Staffordshire terrier.[15]  Berman Aff'd, Exhibit # 2 at pp. 202.

Berman's expert report cites 25 separate studies conducted between 1989 and 2021 that support his conclusion that "Pitbulls have consistently been identified as inflicting more severe wounds, when they do attack, than other breeds."  Berman Aff'd, Exhibit # 2 at pp. 7-12.  All of these studies are attached to Berman's affidavit and will not be explained in-depth here.  However, it is important to note that these studies are not "ancient" or based on "old science."  For example, a 2018 study in the Journal of Orthopedic Trauma concluded that "Pit bull terrier bites were responsible for a significantly higher number of orthopaedic injuries and resulted in an amputation and/or bony injury in 66% of patients treated, whereas bites from law enforcement dogs and other breeds were less associated with severe injuries." [16]  Id. at p. 142.  Berman noted that law enforcement dogs are trained to bite on command and continue biting until commanded to stop. Id. at p. 10.  Berman opined this study shows that "Pit bull terrier bites were more severe, than dogs actually trained to bite hard and often to hold on, provides an excellent demonstration of how devastating Pit bull bites can be."  Id.

_____

[13] See Footnote 12.

[14] Abraham, J., Czerwinski, M. 2018 'Pediatric Dog Bite Injuries in Central Texas' *Journal of Pediatric Surgery* Vol. 54, Issue 7, pp. 1416-1420, Published Nov. 22, 2018.

[15] Montrose, V.T., Squibb, K., Hazel, S., Kogan, L.R., Oxley, J.A., 'Dog bites dog: The use of news media articles to investigate dog on dog aggression' *Journal of Veterinary Behavior* (2020), doi: https://doi.org/10.1016/j.jveb.2020.08.002.

[16] Brice, J., Lindvall, E., Hoekzema, N., Husak, L., et al. 2018 'Dogs and Orthopedic Injuries: Is There a Correlation With Breed?' *Journal of Orthopedic Trauma*, Sep;32(9):e372-e375. doi: 10.1097/BOT.0000000000001235.

This is consistent with two other cited 2018 studies which establish that: 1) "Dogs regarded as dangerous such as the pit bull and their cross-bred derivatives take origin from their chequered history as fighting dogs…These dogs gain further infamy with reports that they are accountable for injuries of such severity that they require surgical intervention;"[17] and 2) "Attacks by Pit Bull Terriers are more likely to cause severe morbidity than other breeds of dogs.  Immediate surgical exploration is required to prevent catastrophic outcomes, especially limb loss.[18]"  Berman Aff'd, Exhibit # 2 at pp. 144, 126.

Additional studies published in 2019 also provide substantial support for the City's pit bull ordinance.  These 2019 studies showed that "[i]njuries from Pitbull's and mixed breed dogs were both more frequent and more severe.[19]"  Id. at p. 169.  This same study concluded that "Mixed breed and Pit-bulls were found to not only have the highest relative risk of biting, but were also found to have the highest average tissue damage per bite."  Id. at p. 171.

Berman also notes a study published in 2019 found that "compared with other dog breeds, pit bull terriers inflicted more complex wounds, were often unprovoked, and went off property to attack.[20]"  Id. at p. 180.  Berman noted that "Pit bulls being of the terrier group often do not stay within their own territorial boundaries when showing aggression but will leave their territory and enter the territorial boundaries of other dogs or humans in order to attack them…Simply being in

---

[17] See Footnote 12.

[18] Harnarayan, P., Islam, S., Ramsingh, C., and Naraynsingh, V. 2018 'The Pit Bull attack causing limb threatening vascular trauma - A case series' *International Journal Surgical Case Reports*, 42: 133-137.  Quotation found at Berman Aff'd, Exhibit # 2 at p. 126.

[19] Essig, G.F., Sheehan, C., Rikhi, S., Elmaraghy, C., Christophel, J.J.  2019 'Dog bite injuries to the face: Is there risk with breed ownership? A systematic review with meta-analysis.' *International Journal of Pediatric Otorhinolaryngology*, 117:182-188.

[20] Khurram, K., Horswell, B., Samanta, D. 2019 'Dog-Bite Injuries to the Craniofacial Region: An Epidemiologic and Pattern-of-Injury Review at a Level 1 Trauma Center' *Journal of Oral Maxillofacial Surgery*, 78(3):401-413. doi:10.1016/j.joms.2019.11.002.

the area can be enough to set off the aggression of overly aggressive Pit bulls."  Id. at p. 12.

These findings are found in scientific literature into this decade.  For example an article published in the March 2020 edition of Veterinary World found that "Pit Bulls, in particular, have been found to inflict bites that result in serious trauma or death.[21]"  Id. at p. 184. Further, another study published in 2020 concluded the "German Shepherd and Pit Bull-type breeds account for the largest subset of pure breeds implicated in severe dog bites inflicted on humans in the medical literature.[22]" Id. at p. 210. Even as recently as June 2021, an article published in the Annals of Plastic Surgery concluded that an evaluation of 356 pediatric patients who presented to the Virginia Commonwealth University Pediatric Emergency Department with dog bite injuries showed the "most common offending breed was a pit bull or pit bull mix" at 53% of all dogs identified.[23]  Id. at p. 213.

There are numerous studies in the record published prior to 2018 which stand for proposition that Pit bulls bit more frequently and inflict more serious injuries than other dog breeds. Id. at pp. 7-9.  The findings in the above-referenced 2019 study finding that Pit bulls have a propensity to attack while unprovoked[24] were also noted in a 1991 study that concluded "[s]ignificantly more pit bull injuries (94% vs. 43% P< .001) were the consequence of unprovoked attacks…."[25]  Id. at p. 61.  Berman's report explains in detail why this is problematic:

---

[21] Hasoon, B., Shipp, A., and Hasoon, J. 2020 'A look at the incidence and risk factors for dog bites in unincorporated Harris County, Texas, USA' *Veterinary World*, 13(3): 419-425.
[22] Bailey, C., Hinchcliff, K., Moore, Z., and Pu. L. 2020 'Dog Bites in the United States from 1971 to 2018: A Systematic Review of the Peer-Reviewed Literature' *Plastic and Reconstructive Surgery,* 146(5):1166-1176.
[23] Munoz, R., D., K., Powell, L. E., Andersen, E.S., Nye, A.D., Powers, J.M., Rhodes, J., Pozez, A.L. 2021 'Analysis of Pediatric Dog Bite Injuries at a Level 1 Trauma Center Over 10 Years' *Annals of Plastic Surgery:* Vol. 86 – Issue 6S – pp. S510-S516.
[24] See Berman Aff'd. Exhibit # 2 at p. 180.
[25] Avner, J., Baker, M. 1991 'Dog Bites in Urban Children' *Pediatrics,* 88 (1) pp. 55-57.

> A dog that attacks without provocation is extremely dangerous because potential victims have no idea that what they are doing will cause the dog to bite. As a result, there is no way to defend yourself. Dogs that cause serious injury without provocation are normally labeled as "vicious" based on the writer's personal experience reviewing animal control records and ordinances from many hundreds of municipalities. It has also been this writer's experience, that unprovoked attacks are often serious attacks, more often involving multiple bite wounds to multiple body parts, shaking of the victim and dogs that will continue to attack unless stopped by an owner or other individuals who also risk injury.

Id. at p. 7.

Suffice it to say, there is ample authority which stands for the proposition that Pit Bulls pose risk to the health, welfare, and safety of the Citizens of Williston as explained in detail by both Dr. Golinko, Berman, and the voluminous studies attached in support of this motion.

### E.    How the Pit Bull Ordinance is Enforced.

Generally, when a Williston Police Officer suspects an individual possesses a Pit bull in violation of § 4-89, a Community Services Officer is called to the scene.[26]  Wade Aff'd at ¶ 4.  If the officer identifies the dog as a Pit bull the dog is impounded and a citation is issued which identifies the date for the owner's initial court appearance. Id. Notably, Community Service Officers carry DNA swabs with them in the field.  Wade Aff'd at ¶ 5.  If the dog owner disputes the determination that the dog is a prohibited breed, they can request a DNA test which the City will provide at its own expense.  Olson Aff'd at ¶¶ 5, 11.  The City uses WisdomPanel ™ to conduct DNA tests on suspected pit bulls to ensure the visual identification is accurate.  Wade Aff'd at ¶ 6; Olson Aff'd at ¶¶ 24, 39.

With respect to breed identification, Berman, who has 43 years of experience as a canine behavioral consultant and dog trainer, noted the City utilizes a "two-stage process, using both the

---

[26] Animal control is within the scope of the City's Community Service Officer's job duties.  Wade Aff'd at ¶¶ 1-4.

ability of an experienced animal control officer and (when requested) a DNA test for confirmation makes the City of Williston's approach and practice of identifying prohibited dogs state of the art and therefore as reliable as possible." Berman Aff'd, Exhibit # 2 at p. 15. This process ensures sufficient evidence exists to support charges for violation of § 4-89. Olson Aff'd at ¶ 12.

At the initial appearance, the owner is provided with a "Notification of Rights and Acknowledgement" form that explains their rights. Olson Aff'd at ¶ 8; Exhibit # 1. Owners are provided the same rights as any criminal defendant which include - but are not limited to - the right to counsel, right to plead guilty or not guilty, right to be presumed innocent until the "city proves beyond a reasonable doubt that you have committed each and every element of the offense," right to cross-examine and present witnesses, and the right "[t]o have a trial by jury in District Court **if you make a written request for jury trial within 28 days following a plea of not guilty**. If your case remains in municipal court and you are found guilty before a judge in municipal court you may appeal to the District Court for a new trial before a judge." Olson Aff'd at ¶¶ 9-10, Exhibit # 1 (emphasis in original). The form also provides the owner with the opportunity to request a continuance to consult with counsel, plead guilty, or plead not guilty to the offense. Id.

Since violation of § 4-89 is a B misdemeanor, anyone charged with violating this ordinance is afforded the same procedural safeguards as any other criminal defendant charged with violating a municipal ordinance under North Dakota law. Olson Aff'd at ¶ 13. This process will be explained in the procedural due process argument in a later section of this memorandum.

F.    **The Plaintiffs**

As an initial matter, Shoghi Farr, Natasha Calderon, Blake Ish, Doc Ritchie, and Bryan Fleming voluntarily dismissed their claims against the City. Docs. 48, 59. The remaining

Plaintiffs can be separated into 2 distinct categories: 1) Individuals who were cited and entered a guilty plea to violation of § 4-89; and 2) Individuals who never received a citation.

1.      Plaintiffs who were cited and entered a guilty plea to violation of § 4-89

i.      *Reannan Suckley*

Reannan's dog was picked up as a stray on February 10, 2020. Olson Aff'd at ¶¶ 17-19; Exhibit #'s 2-4.   ACO Wade identified the dog as a pit bull and issued Reannan a citation after she admitted to owning the dog.  Olson Aff'd at ¶ 19; Exhibit # 4.  The citation identified February 13, 2020, as the date for her initial appearance.  Id.

On February 13, Reannan signed her Notification of Rights and Acknowledgement form and initially entered a plea of not guilty.  Olson Aff'd at ¶ 20; Exhibit # 5.  The court scheduled a subsequent court date for March 9, 2020.  Id. at p. 3.  Reannan obtained counsel the following day. Olson Aff'd at ¶ 21; Exhibit # 6.  A DNA test was conducted through Wisdom Panel which confirmed Reannan's dog was a 100% American Staffordshire Terrier on February 27, 2020.  Id. at Exhibit # 9.

On March 4, 2020, Reannan signed a notarized letter admitting her "dog is the type of breed that is prohibited in the City of Williston."  Olson Aff'd at ¶ 25; Exhibit # 10.  Reannan entered into a March 9, 2020, "Misdemeanor Petition to Enter Plea of Guilty" where she pleaded "guilty to the offense of having a Pitbull in City Limits, City of Williston Ordinance 4-89."  Olson Aff'd at ¶ 26; Exhibit # 11.  Reannan also consented to search of her premises to ensure she does not possess a Pit bull within City limits.  Olson Aff'd at Exhibit # 13.  Her guilty plea was accepted by Judge Zander on March 12, 2020.  Olson Aff'd at ¶ 27; Exhibit # 12.  Judge Zander ordered Reannan to pay $350 in fines, the dog returned to Reannan on the condition it was removed from City limits within 10 days, and imposition of any sentence was deferred.  Id.  Reannan Suckley

does not live within the City of Williston.  Schmidt Aff'd, Exhibit # 1 at p. 1.

       *ii.*     *Jyl Albertson*

On March 27, 2020, Williston Police Officer Klapper pulled Albertson over for a traffic infraction.  Olson Aff'd at ¶ 29; Exhibit # 14.  Albertson explained she just moved to Williston to work as a teacher and would return to Georgia when the school year ended.  Id.  Officer Klapper observed a dog in the front passenger seat that resembled a Pit bull.  Id.  Albertson told Officer Klapper the dog was her mixed breed puppy.  Id.

Upon returning to her vehicle, Officer Klapper contacted ACO Wade who requested a picture of the dog to confirm whether it was a Pit bull.  Id.  Officer Klapper took a picture of Albertson's dog and sent it to ACO Wade who confirmed the dog was a Pit bull.  Id.  Albertson received a citation for violating § 4-89.  Id.

Albertson was provided her rights and pled guilty to violating Williston City Code § 4-89 on April 17, 2020.  Olson Aff'd at ¶¶ 31-32; Exhibit #'s 16-17.  Albertson also provided an April 17, 2020, affidavit indicating her dog would stay with a friend outside the City Limits until the end of May when she would move the dog back to Covington, Georgia.  Olson Aff'd at ¶ 33; Exhibit # 18.  Albertson's guilty plea was accepted by Judge Zander on April 23, 2020.  Olson Aff'd at ¶ 34; Exhibit # 19.  She was ordered to pay a fine of $350 for violation of Section 4-89.  Id.

       *iii.*     *Mathew Baumstark*

On March 17, 2020, ACOs Wade and Moeller were in the process of a shift change when they noticed Baumstark walking a black dog on a leash on 4th Ave. in Williston.  Olson Aff'd at ¶ 36; Exhibit # 21.  The dog appeared to be a lab, Pit bull mix.  Id.  ACO Moeller approached Baumstark who did not deny the dog was a Pit bull.  Id.  Baumstark questioned if the Pit bull ban was new, and was informed it had been the law since the 1980's.  Id.  Baumstark stated the dog's

name was Brutus and it belonged to his girlfriend, Danika Owen.  Id.; Doc. 1 at ¶ 63.  Baumstark was issued a citation for violation of Section 4-89.  Id.

On March 19, 2020, Baumstark was provided his rights and requested a continuance. Olson Aff'd at ¶ 38; Exhibit # 23.  Baumstark requested a DNA test be conducted on Brutus.  Id. A DNA test was administered at the City's expense which showed Brutus was 50% American Staffordshire Terrier.  Olson Aff'd at ¶ 39; Exhibit # 24.  On April 14, 2020, Baumstark pled guilty to violating Section 4-89.  Olson Aff'd at ¶ 40; Exhibit # 25.  Judge Zander accepted Baumstark's plea, ordered Baumstark to pay a $350 fine, remove Brutus from City Limits within 5 days, and entered judgment on April 16, 2020.  Olson Aff'd at ¶ 41; Exhibit # 26.  In lieu of removing Brutus from the City Limits, Baumstark elected to euthanize Brutus on April 21, 2020.  Olson Aff'd at ¶ 42; Exhibit # 27.  This decision was made on Baumstark's accord and the City never required Brutus be euthanized.  Id.

*iv.   Emily Holly*

On January 7, 2021, ACO Wade responded to a call reporting a Pit bull type dog was chained outside of a residence located at 612 4th St. W. within the City Limits.  Doc. 27-1 at p. 2. Upon arrival, ACO Wade drove through the ally and confirmed a brown Pit bull type dog was chained up in the back yard.  Id.  Holly approached the residence in an SUV, exited the vehicle and confirmed the dog was hers.  Id.  Holly asserted the dog's name is Capone and she believed it was a 9-year-old American Bulldog.  Id.

ACO Wade received permission to inspect the dog and confirmed it showed the characteristics of being a Pit bull type dog.  Id.  ACO Wade advised Holly that possession of Capone was illegal within the City Limits, she would be cited for violation Section 4-89, and could request a DNA test through the courts.  Id.  Photographs were taken and Capone was not

impounded. Id.

Holly appeared for her January 21, 2021, initial appearance and was notified of her rights. Doc. 27-2 at p. 2.   On January 25, 2020, Holly pled guilty to violating Section 4-89 and consented to a search of her premises to ensure she does not possess a Pit bull, agreed to a $350 fine, and agreed to remove Capone from the City Limits within 10 days.  Doc. 27-3.  Judge Zander accepted the guilty plea and issued an order consistent with the terms of her plea.  Doc. 27-4.  Judgment was entered on January 25, 2021.  Id.

Holly filed a motion for a TRO on February 2, 2021.  Doc. 18.  The parties entered into a Joint Stipulation to suspend the requirements of the January 25, 2021, Judgment from municipal court pending final judgment in the present action.   Doc. 34.   The Court approved the Joint Stipulation on March 3, 2021, and the TRO was dismissed as moot.  Docs. 35-36.

2.      Plaintiffs who never received a citation for violation of § 4-89.

i.      *Lynette Cole-Perea and Manuel Perea*

Neither Lynette Cole-Perea nor Manuel Perea have ever been cited for violating § 4-89. Olson Aff'd at ¶ 45; Schmidt Aff'd, Exhibit # 2 at p. 2; Exhibit # 3 at p. 2.  Lynette and Manuel have been married since May 21, 2015.  Schmidt Aff'd, Exhibit # 4 at p. 3; Exhibit # 5 at p. 3.

On September 10, 2020, police responded to report of a fight in a parking lot that involved Lynette.  Olson Aff'd at ¶ 46; Exhibit # 29.  Lynette advised the officer that she "was trying to get her schizophrenic husband in the car."  Id. at p. 3.  She explained she went to her friend's house "to pick up a package, and her husband took the dog for a walk."  Id.  The responding officer interviewed Manuel and mentioned the dog was a pit bull.  Id. at p. 4.  "Manuel advised that it was a service animal and provided Officer Cruise with the service animal card.  Officer Cruise had a name note attached to Manuel about the dog being a service animal for any future contacts with

- 18 -

him." Id. at p. 4.  Notably, Lynette was charged with resisting arrest/escaping custody and profane language in public, but no citations were issued for a violation of § 4-89 to any parties as a result of this interaction as the Pit bull was determined to be a service animal.  Id. at pp. 3-6.

### ii.    Brandy Suckley

Brandy Suckley is the mother of Reannan Suckley.  Schmidt Aff'd, Exhibit # 6 at p. 2.  Brandy has never been issued a citation for violation of § 4-89.  Id.  However, she paid her daughter's fine after she pled guilty to a violation of § 4-89.  Id.

### iii.    Danika Owan

Owan has lived with Plaintiff, Matthew Baumstark for approximately 6 years.  Schmidt Aff'd, Exhibit # 7 at p. 2.  Owan has never received a citation for violation of § 4-89.  Schmidt Aff'd, Exhibit # 8 at p. 2.  Owan currently owns two dogs that are not of a prohibited breed within the City of Williston.  Schmidt Aff'd, Exhibit # 7 at p. 8.

### G.    Brandy Suckley and Jyl Albertson worked with the City before filing suit.

Prior to filing this lawsuit, Brandy Suckley and Jyl Albertson had communications with the City with respect to changing § 4-89.  A brief explanation of their communications with the City is found below:

On March 2, 2020 - 2 days before her daughter entered her guilty plea - Brandy contacted City Administrator, David Tuan, to indicate her concerns about § 4-89.  Tuan Aff'd at ¶¶ 3-4, Exhibit # 1.  Tuan informed her that "[d]ue to the community response following [the Rickard School] incident, I do not sense the City Commission has any desire to revisit this ordinance or consider an amendment;" however, Tuan forwarded Brandy's concerns to the Commissioners and the City Attorney. Id. at ¶ 4; Exhibit # 1 at p. 1.

In July 2020, Albertson contacted Tuan indicating she wanted guidance as to how they can

"get this put on the ballot for the November election."  Tuan Aff'd at ¶ 5; Exhibit # 2 at p. 4.  Tuan offered to meet with both Albertson and Suckley about this matter at City Hall.  Id. at p. 2.  Both Albertson and Suckley expressed their desire to change the ordinance and Tuan informed them they "have every right to exercise the legal process to change the ordinance through political means." Tuan Aff'd at ¶ 7.

On August 21, 2020, Brandy emailed Tuan requesting to be placed on the Commission meeting agenda.  Tuan Aff'd at ¶ 9; Exhibit # 5 at p. 2.  Brandy was placed on the agenda for the September 8, 2020, Commission Meeting.  Id. at p. 1.  She prepared a Power Point presentation which was presented to the City Commissioners and presented before the City Commission on September 8.  Tuan Aff'd at ¶¶ 10-11.  Suckley's presentation did not persuade the Commission that § 4-89 did not further the City's health, safety, and welfare interests.  Piesik Aff'd at ¶ 7; Cymbaluk Aff'd at ¶¶ 10-12; Bekkedahl Aff'd at ¶ 10; Klug Aff'd at ¶ 11.  After her presentation, Suckley again contacted Tuan indicating she desired for § 4-89 be on the ballot for the upcoming election. Tuan Aff'd at ¶ 14; Exhibit # 10. To date, there has been no action taken to repeal or amend § 4-89 and no petition was ever submitted to the City to be placed on the ballot[27]. Id. at ¶ 15.

---

[27] As explained above, Williston is a Commission system of government as defined by North Dakota law.  For cities operating under the commission form of government, "[a]ny proposed ordinance may be submitted to the governing body of the municipality by a petition signed by qualified electors thereof equal in number to fifteen percent of the votes cast for the executive officer at the preceding regular municipal election.  The petition must be filed in the city auditor's office and must contain a request that the ordinance set out in the petition be submitted to a vote of the qualified electors of the city if it is not passed by the governing body of the municipality." N.D.C.C. § 40-12-02.  A petition requesting an ordinance to repeal § 4-89 be submitted to a vote of the qualified electors of Williston, if not passed by the governing body, has never been submitted to the City Auditor.  Tuan Aff'd at ¶ 15.

### H.     The City Has Received Substantial Support for § 4-89.

Prior to lawsuit, the City received a substantial amount of material in support of § 4-89. Tuan Aff'd at ¶¶ 6, 8, Exhibit #'s 3-4.   Further, Commissioners have received support from members of the public with respect to the City's ban on pit bull dogs.   Cymbaluk Aff'd at ¶ 5, Piesik Aff'd at ¶ 4, Klug Aff'd at ¶ 11.   Commission president Klug believes that approximately 80% of the public is in favor of keeping § 4-89.   Klug Aff'd at ¶ 11.   Further, if the Commission was convinced that § 4-89 no longer furthered the health, safety, and welfare of the City, it is certainly open to entertaining changing the ordinance.   Piesik Aff'd at ¶¶ 8-9; Cymbaluk Aff'd at ¶ 12, Bekkedahl Aff'd at ¶ 12.   The City does not take this ordinance lightly and it is the Commission's opinion that it is necessary to preserve the health, safety, and welfare of the City and its inhabitants. Piesik Aff'd at ¶¶ 8-9; Cymbaluk Aff'd at ¶¶ 11-12; Bekkedahl Aff'd at ¶¶ 9-12; Klug Aff'd at ¶¶ 10-12.

## III.   LAW AND ARGUMENT

### A.     Summary Judgment Standard – In general

This Court has expressed the "standards for addressing motions for summary judgment are well known to the court."   Benjamin v. Ward County, 93 F.Supp.3d 1106, 1112 (D.N.D. 2015). Therefore, a detailed explanation of this general standard is unnecessary; however, the "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'"   Celotex Corp. v. Cartrett, 477 U.S. 317, 327 (1986).

A further examination of the interplay of Rule 56 and the rational basis standard of review is found in the substantive due process and equal protection portion of this memorandum.

B.      **Standing**

As an initial matter, "[a]ny person invoking the power of a federal court must demonstrate

standing to do so."  Frost v. Sioux City, Iowa, 920 F.3d 1158, 1161 (8th Cir. 2019). "Standing

must persist throughout all stages of litigation."  Id.   The party invoking federal jurisdiction bears

the burden of establishing the following three elements to establish standing:

> First, the plaintiff must have suffered an "injury in fact"—an invasion of a legally
> protected interest which is (a) concrete and particularized, and (b) actual or
> imminent, not "conjectural" or "hypothetical," Second, there must be a causal
> connection between the injury and the conduct complained of—the injury has to be
> fairly ... trace[able] to the challenged action of the defendant, and not ... th[e] result
> [of] the independent action of some third party not before the court.  Third, it must
> be "likely," as opposed to merely "speculative," that the injury will be "redressed
> by a favorable decision."

Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992) (internal quotations and citations

omitted).

An injury in fact must be both particularized and concrete.  Spokeo, Inc. v. Robins, 578

U.S. 330, 339 (2016).   "For an injury to be 'particularized,' it must affect the plaintiff in a personal

and individual way."  Id (internal quotation omitted).   "A 'concrete' injury must be '*de facto*'; that

is, it must actually exist."  Id. at 340.  A concrete injury must be "real, and not abstract."  Id.  "An

injury in fact requires a 'concrete and particularized' harm that is 'actual or imminent, not

conjectural or hypothetical.'"  Balogh v. Lombardi, 816 F.3d 536, 541 (8th Cir. 2016).   The

imminence requirement "is to ensure that the alleged injury is not too speculative for Article III

purposes - that the injury is '*certainly* impending.'  'Allegations of *possible* future injury' are not

sufficient."  Id (emphasis in original) (internal quotations omitted).

Further, "it must be likely, as opposed to merely speculative, that the injury will be

redressed by a favorable decision."  Frost v. Sioux City, Iowa, 920 F.3d 1158, 1161 (8th Cir. 2019).

"An injunction is inherently prospective and cannot redress past injuries."  Id.  "The mere fact that

- 22 -

injurious activity took place in the past does nothing to convey standing to seek injunctive relief against future constitutional violations." Harmon v. City of Kansas City, Mo., 197 F.3d 321, 327 (8th Cir. 1999). Additionally, an action for "declaratory relief must involve 'an adjudication of present right upon established facts.'" Frost, 920 F.3d at 1161-62. "[P]ossible future litigation or policy changes are too speculative to invoke 'an adjudication of present right upon established facts.'" Id. at 1162 n. 1 (quoting Aetna Life Ins. Co. v. Haworth, 300 U.S. 227, 242 (1937)). "In a case of this sort, where the plaintiffs seek declaratory and injunctive relief, past injuries alone are insufficient to establish standing. Rather, [the plaintiff] must show he is suffering an ongoing injury or faces an immediate threat of injury." Id. at 1162 (quoting Dearth v. Holder, 641 F.3d 499, 501 (D.C. Cir. 2011).

The Eighth Circuit recently held the past seizure of Pit bulls "cannot be redressed by a declaratory judgment because no 'present right' related to those dogs is at stake." Frost, 920 F.3d at 1162. "Standing must persist throughout all stages of litigation." Id. at 1161. Where a plaintiff seeks "prospective relief against future conduct of defendants who caused injury in the past…she must show that she faces a real and immediate threat that she would again suffer similar injury in the future." Id (citation omitted). When a plaintiff no longer lives in the city where a Pit bull ban is challenged, the "threat of future injury to [a plaintiff] from the pit bull ban is 'conjectural or hypothetical' and therefore insufficient to confer standing." Id.

Against this background, many – if not all – Plaintiffs will not be able to meet their burden to establish standing to challenge § 4-89 based on the facts discussed above. Nonetheless, the City is entitled to summary judgment on the merits of each of the Plaintiffs' claims.

C.    **§ 4-89 is a Public Safety law that does not implicate a fundamental right and rational basis review applies.**

There are two aspects of § 4-89 that require substantial deference be given to City's

ordinance.  First, it is a public safety law.  Second, it does not implicate a fundamental right.  As a result-under current precedent -§ 4-89 is subject to a rational basis standard of judicial review[28].

       1.        § 4-89 is a Public Safety Law.

The stated purpose of § 4-89 is to "protect the health, safety and welfare of the residents and citizens of the City of Williston."  Doc. 28-1 at p. 1.  The City is well-within its authorized rights to enact ordinances for this purpose.  See N.D.C.C. § § 40-05.1-06(10); H.R.C. Art. 6.  The Supreme Court has also recognized the "promotion of safety of persons and property is unquestionably at the core of the State's police power, and virtually all state and local governments employ a uniform police force to aid in the accomplishment of that purpose."  Kelley v. Johnson, 425 U.S. 238, 247 (1976).  It has long been the law of this country that dogs are "subject to the police power of the state, and might be destroyed or otherwise dealt with, as in the judgment of the legislature is necessary for the protection of its citizens."  Lunon v. Bostford, 946 F.3d 425, 430 (8th Cir. 2019) (quoting Sentell v. New Orleans & C.R. Co., 166 U.S. 698, 704 (1897)).

When challenging an ordinance designed to promote public safety the plaintiff must "demonstrate there is no rational connection between the regulation, based as it is on the [City's] method of organizing its police force, and the promotion of safety of persons and property."  Kelley, 425 U.S. at 247. "The party challenging public safety laws must prove by clear and convincing evidence that the law is unconstitutional."  New York City Friends of Ferrets v. City

---

[28] The City acknowledges other courts have applied a substantive due process and equal protection analysis to pit bull ordinances and that analysis is included.  However, the City does not concede that substantive due process or equal protection apply to this case.  See Cruzan by Cruzan v. Dir. Missouri Dept. of Health, 497 U.S. 261, 294 ("It is at least true that no 'substantive due process' claim can be maintained unless the claimant demonstrates that the State has deprived him of a right historically and traditionally protected against state interference.") (J. Scalia concurrence). There is no evidence that §4-89 denies any person within the City's jurisdiction equal protection of the laws as required for an equal protection claim.  City of Cleburne, Tex. V. Cleburne Living Center, 473 U.S. 432, 439 (1985).

of New York, 876 F.Supp. 529, 535 (S.D.N.Y. 1995) (citing In Re Winship, 397 U.S. 358 (1970);

see also Vanater v. Village of S. Point, 717 F.Supp. 1236, 1242 (S.D. Ohio 1989) (citing In Re

Winship) (holding same).

      The North Dakota Supreme Court has relied on two separate U.S. Supreme Court cases in

setting forth the appropriate framework for evaluating a municipal ordinance enacted for the

protection of public health, safety, and welfare:

> The test for determining whether a legislative enactment constitutes an invalid
> exercise of the police power is stated in Soderfelt v. City of Drayton, 79 N.D. 742,
> 752, 59 N.W.2d 502, 507 (1953)[29]:
>
>> "Statutory enactments and **municipal ordinances having for their
>> purpose the protection of the public health, safety, morals and
>> public welfare** are founded upon the police power inherent in the
>> state. In passing upon the constitutionality of such statutes or
>> ordinances the **courts will not declare them unconstitutional and
>> thus substitute their judgment for that of the legislative body
>> charged with the primary duty and responsibility of
>> determining the question where the question is fairly debatable,
>> that is, unless the statute or ordinances are clearly arbitrary and
>> unreasonable having no substantial relation to the public health,
>> safety, morals or public welfare**."
>
> See also Village of Euclid, Ohio v. Ambler Realty Co., 272 U.S. 365, 47 S.Ct. 114,
> 71 L.Ed. 303 (1926).

Newman Signs, Inc. v. Hjelle, 268 N.W.2d 741, 756 (N.D. 1978) (emphasis added).

      In other words, if a public safety ordinance is not arbitrary and related to protecting the

public, it cannot be disturbed by the Court. This is especially true where – as here – the ordinance

does not infringe upon a fundamental right.

      2.      Ownership of a pit bull is not a fundamental right.

      The Eighth Circuit recently noted that "[p]roperty in dogs…may be subjected to peculiar

---

[29] In Soderfelt, the Court relied upon Radice v. People of the State of New York, 264 U.S. 292
(1924) for the quoted language below. See Soderfelt, 79 ND 742, 59 N.W.2d at 752-53.

and drastic police regulations by the state without depriving their owners of any federal right."
<u>Lunon</u>, 946 F.3d at 430 (<u>quoting</u> <u>Nicchia v. People of State of New York</u>, 254 U.S. 228, 231
(1920)). This holding has been reiterated by federal courts across the country. <u>See</u> <u>Vanater</u>, 717
F.Supp. at 1243 ("dog ownership is not considered one of the cherished rights which the Court
must carefully protect."); <u>see also</u> <u>American Canine Foundation v. City of Aurora, Colo.</u>, 618
F.Supp.2d 1271, 1278 (D. Colo. 2009) ("Ownership of a dog does not implicate any fundamental
right"); <u>Weigel v. Maryland</u>, 950 F.Supp. 2d 811, 835 (D. Md. 2013) ("The right to own and keep
dogs is not fundamental.").  It has further been held that a pit bull prohibition ordinance "does not
make a 'suspect classification' such as a law based on race or nationality, the test to determine its
constitutionality is whether it has a rational relationship to a legitimate state interest." <u>Vanater</u>,
717 F.Supp. at 1242 (<u>citing</u> <u>Ohio Bureau of Employment Services v. Hodory</u>, 431 U.S. 471, 489
(1977).  "Where a law neither implicates a fundamental right nor involves a suspect or quasi-
suspect classification, the law must only be rationally related to a legitimate government interest.
Such a law is accorded a strong presumption of validity, and is upheld if there is any reasonably
conceivable state of facts that could provide a rational basis for the classification." <u>Gallagher v.
City of Clayton</u>, 699 F.3d 1013 (8th Cir. 2012) (internal citations and quotations omitted).  Clearly,
§ 4-89 is subject to rational-basis review if any at all.

      3.     Rational Basis Review.

The Supreme Court set forth the following framework for a rational-basis standard of
review in <u>F.C.C. v. Beach Communications, Inc.</u>, 508 U.S. 307, (1993) as follows:

> On rational-basis review, a classification in a statute…comes to us bearing a **<u>strong
> presumption of validity, and those attacking the rationality of the legislative
> classification have the burden to negative every conceivable basis which might
> support it</u>**. Moreover, because we never require a legislature to articulate its
> reasons for enacting a statute, it is entirely irrelevant for constitutional purposes
> whether the conceived reason for the challenged distinction actually motivated the

legislature. Thus, the absence of legislative facts explaining the distinction [o]n the record, has no significance in rational-basis analysis. **In other words, a legislative choice is not subject to courtroom fact-finding and may be based on rational speculation unsupported by evidence or empirical data**. Only by faithful adherence to this guiding principle of judicial review of legislation is it possible to preserve to the legislative branch its rightful independence and its ability to function.

Id. at 314 (quotations and citations omitted, alteration in original).

Put another way:

The Constitution presumes that, absent some reason to infer antipathy, even improvident decisions will eventually be rectified by the democratic process and that judicial intervention is generally unwarranted no matter how unwisely we may think a political branch has acted. Thus, we will not overturn such a statute unless the varying treatment of different groups or persons is so unrelated to the achievement of any combination of legitimate purposes that we can only conclude that the legislature's actions were irrational.

Vance v. Bradley, 440 U.S. 93, 97 (1979).

Under the rational-basis review standard, it is well-settled the City is not required "to place any evidence in the record, let alone the extensive evidentiary showing that would be required for [an ordinance] to survive heightened scrutiny." Heller v. Doe by Doe, 509 U.S. 312, 319 (1993). A rational-basis review "is not a license for courts to judge the wisdom, fairness, or logic of legislative choices." Beach Communications, 508 U.S. at 313. The Plaintiffs cannot overcome this high bar to survive summary judgment.

**D.** **The City is entitled to summary judgment with respect to the Plaintiffs' Equal Protection and Due Process claims under a rational basis review.**

As explained above, it is well-established ownership of pit bulls does not implicate a fundamental right and rational basis applies to the Plaintiffs' claims arising under substantive due process and equal protection. Birchansky v. Clabaugh, 955 F.3d at 757 (8th Cir. 2020); see also Vanater, 717 F.Supp at 1242-43. "A rational basis that survives equal protection scrutiny also satisfies substantive due process analysis." DeCrow v. North Dakota Workforce Safety &

Insurance Fund, 864 F.3d 989, 992 (8th Cir. 2017) (quotation omitted).  Therefore, the Plaintiffs'
equal protection and substantive due process claims will be analyzed together.

The City is not required to place any evidence in the record to justify its legislative choice
under a rational basis review as the ordinance must be upheld even in the face of rational
speculation unsupported by any evidence or empirical data.   Heller, 509 U.S. at 319; Beach
Communications, Inc., 508 U.S. at 314 (1993).  Even though not required, the City has adduced
substantial evidence to justify its position that § 4-89 serves a legitimate government interest in
protecting the City's safety, health, and welfare.  Most notably, Dr. Golinko's published 2017
study showed "[t]here was over a **three times greater risk in the injury being treated in the
operating room** (OR) (as a proxy for severity of injury) **when a pit bull was identified as the
biting dog**." Golinko Aff'd, Exhibit # 2 at p. 3 (emphasis added).  This was confirmed by his
published 2018 study which showed "pit bull-injuries were over 3-times as likely to be associated
with" severe injuries warranting operating room interventions. Id. at p. 3.  Based on Golinko's
experience "coupled with the overwhelming preponderance of published literature from
everywhere in the world…citing pitbull injuries causing more morbidity and mortality than other
breeds, points to a strong argument for adequate government protection of the public." Id.  This
is consistent with Berman's Report which cites numerous studies on this subject matter indicating
pit bulls were responsible for the most dog-bite injuries of any breed.  Berman Aff'd, Exhibit # 2
at pp. 5-6.  Berman's report also references 25 separate studies between 1989 and 2021 to support
his conclusion that "Pitbulls have consistently been identified as inflicting more severe wounds,
when they do attack, than other breeds."  Id. at pp. 7-12.  Further, it has been found that
"significantly more pit bull injuries…were the consequence of unprovoked attacks."  Berman

Report at p. 61.  Unfortunately, it appears the nanny and children at the Rickard Elementary School playground are proof that these studies do indeed reflect reality.

The summary judgment standard "provides the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).  This is further explained in Anderson as follows:

> As to materiality, **the substantive law will identify which facts are material**. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted. See generally 10A C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure § 2725, pp. 93– 95 (1983). This materiality inquiry is independent of and separate from the question of the incorporation of the evidentiary standard into the summary judgment determination. That is, while the materiality determination rests on the substantive law, **it is the substantive law's identification of which facts are critical and which facts are irrelevant that governs**. Any proof or evidentiary requirements imposed by the substantive law are not germane to this inquiry, since materiality is only a criterion for categorizing factual disputes in their relation to the legal elements of the claim and not a criterion for evaluating the evidentiary underpinnings of those disputes.

Id. at 248 (emphasis added).

With respect to the rational-basis review, substantive law instructs that the only material fact is whether "there is any reasonably conceivable state of facts that **could** provide a rational basis for the classification."  Beach Communications, 508 U.S. at 313 (emphasis added).  This Court has stated the "basic inquiry is whether the evidence presents a sufficient disagreement to require full consideration on the merits by a jury, or whether it is so one-sided that one party must prevail as a matter of law. When the unresolved issues in a case are primarily legal rather than factual, summary judgment is particularly appropriate."  Johnson v. Auto-Owners Ins. Co., 2009 WL 762109, at *2 (D.N.D. Mar. 19, 2009) (internal citations omitted).  The unresolved issue  -

whether there is any reasonably conceivable state of facts that could provide a rational basis for §
4-89 - is clearly ripe for summary judgment.

Further, the plain language of <u>Beach Communications</u> explains that a constitutional
challenge subject to rational-basis review is ripe for summary judgment. It is well-settled that
"legislative choice is **not subject to courtroom fact-finding** and may be based on **rational
speculation unsupported by evidence or empirical data.**" <u>Beach Communications</u>, 508 U.S. at
313 (emphasis added).  All that is required is the legislative body acknowledged there was a
problem "at hand for correction, and that **it might be thought** that the particular legislative
measure was a rational way to correct it." <u>Hughes v. City of Cedar Rapids, Iowa</u>, 840 F.3d 987,
996 (8th Cir. 2016) (quotation omitted) (emphasis added).

As expected, the Plaintiffs have numerous experts who believe § 4-89 does not further a
legitimate government interest because they believe pit bulls are no more dangerous than any other
type of dog.  They also will argue the ordinance is impossible to enforce because visual breed
identification is an unreliable means of identifying the breed of a dog[30].  In sum, the Plaintiffs will
argue the science on pit bulls has changed.  This may very well be their opinion, but that is woefully
insufficient to overturn § 4-89 in light of a substantive due process or equal protection challenge.
Further, their opinions do not create a dispute of material fact to deny summary judgment.  <u>See</u>
<u>Danker v. City of Council Bluffs, Iowa</u>, 2021 WL 5326409, at *12 (S.D. Iowa Oct. 29, 2021).[31]

---

[30] Notably, the evidence in the record establishes that any individual charged with violating § 4-
89 may request a DNA test be performed at the City's expense. Olson Aff'd at ¶¶_5, 11. Further,
any individual may obtain their own DNA test to present to the Court as evidence. <u>Id</u>. Additionally,
any dog owner may DNA test their dog before bringing it into the City limits to determine whether
or not it is a prohibited breed. Notably, to date, the City has not had a DNA test conflict with its
visual identification which led to the issuance of a citation for violation of § 4-89. Wade Aff'd at
¶ 7.
[31] <u>Danker</u> is currently on appeal at the Eighth Circuit in Case No. 21-3794.

Notably, in <u>Danker</u>, the district court was also faced with an equal protection and substantive due process challenge to its pit bull prohibition ordinance and granted summary judgment based on the following rationale:

> This court's problem with the dog owners' "current science" and "change of circumstances" arguments and any cases that accepted them is not the paucity of authority supporting them. Rather, this court's problem is more fundamental: This court is concerned that accepting such arguments invites the kind of "courtroom fact-finding," years later, that the court is not permitted to engage in under rational basis review, in the first instance. *Beach Comms.*, 508 U.S. at 315, 113 S.Ct. 2096. Asking the court to engage in such latter-day fact-finding and to let its determination supplant that of the legislative body that originally enacted the statute, law, or ordinance would give the court a license to judge the wisdom, fairness, or logic of legislative choices long after the fact, when the court would not have been able to do so in a review more nearly contemporaneous with enactment of the law. That, too, violates the principles limiting rational basis review. *Id.* at 313, 113 S.Ct. 2096. Indeed, even if the ordinance is "improvident," "[t]he Constitution presumes that [the ordinance] will eventually be rectified by the democratic process and that judicial intervention is generally unwarranted no matter how unwisely [the court or the parties] may think [the city has] acted." *Id.* at 314, 113 S.Ct. 2096. The ordinance at issue, here, necessarily involved some line-drawing concerning which dogs to ban. Nevertheless, as the Supreme Court recognized in *Beach Communications*, "[t]his necessity renders the precise coordinates of the resulting legislative judgment virtually unreviewable, since the legislature must be allowed leeway to approach a perceived problem incrementally." *Id.* at 316, 113 S.Ct. 2096. This court is not prepared to short-circuit the democratic process in this case and impose its view of facts better addressed by the legislative body. The proper venue for the dog owners' "current science" and "change of circumstances" arguments to overturn the pit bull ban is the responsible legislative body, not the court.

<u>Id</u>. at *12.

Put simply, the Plaintiffs cannot dispute there are numerous studies which show pit bulls are more dangerous than other breeds. The Plaintiffs cannot dispute there are numerous studies which show pit bulls have a higher propensity to bite than other breeds. The Plaintiffs cannot dispute there are studies which continue to show these findings. The Plaintiffs cannot dispute the City has a legitimate government interest in protecting the safety, health, and welfare of its citizens. The Plaintiffs may disagree with those facts, but that does not negate their existence. The

dispositive question for the Court is whether "there is any reasonably conceivable state of facts that could provide a rational basis for the classification." Beach Communications, 508 U.S. at 313.  There is no dispute that there is a "reasonably conceivable state of facts" which support the City's rationale.  The Plaintiffs cannot overcome summary judgment merely because they disagree with those facts, rather they must show a material dispute that those facts exist.  See Newman Signs, 268 N.W.2d at 756 (holding courts will not declare municipal ordinances unconstitutional and substitute their judgment where the question is fairly debatable unless the ordinance is clearly arbitrary and has no relation to public health, safety, or welfare.)  Clearly, they are unable to meet that burden and it is well-settled the Court is compelled "to accept a legislature's generalizations even when there is an imperfect fit between means and ends."  Heller, 509 U.S. at 321 (1993). Here, there is a robust body of peer reviewed studies, expert opinions, and a firm belief of the governing body to support that § 4-89 is rationally related to protecting the health, safety, and welfare of the City.  Therefore, the City is entitled to summary judgment on the Plaintiffs' substantive due process and equal protection claims.

**E.   The City is entitled to Summary Judgment on the Plaintiffs' Remaining Claims**

The Plaintiffs' Complaint also alleges § 4-89 should be overturned because it is unconstitutionally vague and violates their procedural due process rights. Doc. 1 at ¶¶ 132-150. Summary judgment is appropriate on each theory of due process for the reasons explained below:

1.   § 4-89 is not unconstitutionally vague.

The Plaintiffs erroneously allege § 4-89 is "unconstitutionally vague because it fails to provide fair warning of exactly what actions and what animals are prohibited by the Pit Bull Ban."

Doc. 1 at ¶ 133.[32]   The standard for evaluating whether a statute is void for vagueness was explained by the Eighth Circuit as follows:

> The void-for-vagueness doctrine protects persons by providing 'fair notice' of a statute's applicability and by preventing 'arbitrary and discriminatory prosecutions' of a statute's enforcement.  The vagueness doctrine recognizes that '[a] statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application, violates the first essential of due process of law. Void for vagueness simply means that criminal responsibility should not attach where one could not reasonably understand that his contemplated conduct is proscribed.

U.S. v. Ghane, 673 F.3d 771, 776 (8th Cir. 2012) (internal quotations and citations omitted).

It is well-settled that governing bodies "are not required to define every term" in an ordinance.  Adam and Eve Jonesboro, LLC v. Perrin, 933 F.3d 951, 958 (8th Cir. 2019).  Further, "perfect clarity and precise guidance have never been required" and "[l]aws with flexibility and reasonable breadth are permitted [where] it is clear what the ordinance as a whole prohibits."  Id (quotations and citations omitted).  Against this backdrop, numerous courts have considered nearly identical ordinances which prohibit the possession of pit bulls and found them constitutionally permissive.

In Frost v. City of Sioux City, Iowa, 2017 WL 4126986 (N.D. Iowa Sept. 18, 2017), aff'd sub nom. Frost v. Sioux City, Iowa, 920 F.3d 1158 (8th Cir. 2019), the district court noted the following:

> The majority of courts reviewing animal control ordinances that specifically identify the breeds subject to the ordinance—like the Ordinance in this case does— have rejected vagueness challenges.  See 3B C.J.S. Animals § 19 (2017) ("Ordinances identifying the American Pit Bull Terrier, Staffordshire Bull

---

[32] Notably, the Plaintiffs who have already entered a guilty plea to violation of § 4-89 lack standing to challenge the ordinance is void for vagueness.  A plaintiff who has "acknowledged their animals are pit bull dogs…cannot complain of the allegedly vague nature of the ordinance."  Hearn v. City of Overland Park, 772 P.2d 758, 760 (Kan. 1989).  This is because "[o]ne to whose conduct a statue clearly applies may not successfully challenge it for vagueness."  Parker v. Levy, 417 U.S. 733, 756 (1974).

Terrier, and American Staffordshire Terrier as 'pit bulls,' or any dog with the appearance and characteristics of being predominantly Staffordshire Bull Terrier, American Pit Bull Terrier, or American Staffordshire Terrier, as well as dogs 'identifiable' as having any 'pit bull' variety as an element of their breeding, **are not unconstitutionally vague**." (footnotes omitted)).

Id. at * 11 (emphasis added).

Further, it has been held that "the phrase 'commonly known as a pit bull dog' refers to a distinct set of physical and behavioral traits sufficient not only to place an ordinary dog owner on notice as to whether he is covered by the statute, but also to avert the danger of arbitrary and discriminatory enforcement of the statute." State v. Ferguson, 566 N.E.2d 1230, 1232 (Ohio 1991).

Even an Ordinance with substantially less description than § 4-89 was held not to run afoul of the Constitution in City of Lima v. McFadden, 1986 WL 7474, (Ohio Ct. App. June 30, 1986) where the ordinance simply provided that "[n]o person shall keep or harbor more than one pit bull dog at his residence." Id. at * 1. The court held this ordinance was "not vague or indefinite" and noted "the dog owner, who harbors the dogs at his residence, is the one subject to the penalties of the law. He should know the kind of dogs he owns." Id. at *1-2. Further, the court correctly noted that "[w]hether any particular animal falls within this classification is an issue of fact to be determined by the evidence presented.[33]" Id. at * 2.

These holdings are not outliers and there are numerous other decisions from courts across the country holding ordinances – nearly identical to § 4-89 – easily survive a constitutional challenge. See Buchda v. Village of Fall River, No. 15-CV-120-WMC, 2016 WL 2997512 (W.D. Wis. May 23, 2016) (granting summary judgment in favor of municipality whose ordinance

---

[33] As explained in the procedural due process section of this memorandum, any defendant has numerous opportunities to show the City cannot meet its burden of proof to establish the suspect dog is not a "pit bull" as defined by § 4-89.

prohibited keeping "Pit Bull dogs" which were defined as "Any dog which has the appearance or characteristics of being predominantly the above breeds, or any combination of any of those breeds.)[34]; Tarquinio v. City of Lakewood, Ohio, No. 1:11 CV 325, 2011 WL 4458165, at *4 (N.D. Ohio Sept. 23, 2011) (upholding city ordinance which banned the possession of "any dogs that exhibit physical and behavioral characteristics generally conforming to the standards normally associated with pit bulls."); Toledo v. Tellings, 871 N.E.3d 1152, 1158 (Ohio 2007) cert. denied Tellings v. City of Toledo, 552 U.S. 1225 (2008)   (holding the term "pit bull" was not unconstitutionally void for vagueness because "the physical and behavioral traits of pit bulls together with the commonly available knowledge of dog breeds typically acquired by potential dog owners or otherwise possessed by veterinarians or breeders are sufficient to inform a dog owner as to whether he owns a dog commonly known as a pit bull dog" and the City had a "legitimate interest in protecting citizens from the dangers associated with pit bulls.").

In light of this robust consensus of authority, the City is entitled to summary judgment as § 4-89 is not unconstitutionally vague as a matter of law.

       2.     Plaintiffs' Procedural Due Process Claims Fail.

As an initial matter, "[d]ue process is a flexible concept, requiring only such procedural protections as the particular situation demands."  Lunon, 946 F.3d at 430 (internal quotation and citation omitted).  "'[C]onsideration of what procedures due process may require under any given set of circumstances must begin with a determination of the precise nature of the government function involved as well as the private interest that has been affected by governmental action.'" Walters v. Weiss, 392 F.3d 306, 314 (8th Cir. 2004) (quoting Goldberg v. Kelly, 397 U.S. 254 at

---

[34] In Buchda, "those breeds" were defined as the "Staffordshire bull terrier," "American pit bull terrier," and "American Staffordshire terrier."  Buchda,  2016 WL 2997512 at *2.

263 (1970)) (alteration in original). The Eighth Circuit recognizes the "'usual rule' that '[w]here only property rights are involved, mere postponement of the judicial enquiry is not a denial of due process, if the opportunity given for ultimate judicial determination of liability is adequate.'" Mickelson v. County of Ramsey, 823 F.3d 918, 928 (8th Cir. 2016) (quoting Mitchell v. W.T. Grant Co., 416 U.S. 600, 611 (1974)). "It is sufficient, where only property rights are concerned, that there is at some stage an opportunity for a hearing and a judicial determination." Ewing v. Mytinger & Casselberry, 329 U.S. 594, 599 (1950). It is well-settled that "dogs are property" under North Dakota law. Village of Litchville v. Hanson, 19 N.D. 672, 124 N.W.1119, 1120 (N.D. 1910); see also Kautzman v. McDonald, 2001 ND 20, ¶ 27, 621 N.W.2d 871.

The challenged ordinance, § 4-89, is codified within Article VI of the Williston City Ordinances. Article VI contains both § 4-89 and § 4-90. As explained above, § 4-89 prohibits the possession of a dog defined as a "Pit bull dog" "subject to the standards and requirements set forth in § 4-90 of this article." § 4-89. Section 4-90 provides an exception for animals kept pursuant to the ADA or federal or state fair housing laws. § 4-90(a). Section 4-90 further provides that "[a]ny dog found to be the subject of a violation of this article shall be subject to immediate seizure and impoundment." § 4-90(a)(11). Additionally, the penalties for violating Article VI are set forth as follows:

> Any person violating or permitting the violation of any provision of this article **shall upon conviction in municipal court** be fined a sum not more than $500. In addition to the fine imposed the court may sentence the defendant to imprisonment in the county jail for a period not to exceed 30 days. In addition, the court shall order the registration of the subject pit bull revoked and the dog removed from the City. Should the defendant refuse to remove the dog from the City the municipal court judge shall find the defendant owner in contempt and order the immediate confiscation and impoundment of the animal. Each day that a violation of this article continues shall be deemed a separate offense. In addition to the foregoing penalties, any person who violates this article shall pay all expenses, including shelter, food, handling, veterinary care and testimony necessitated by the enforcement of this article.

§ 4-90(a)(12).

The Williston City Ordinances further provide that "[w]henever in this Code or in any ordinance of the City any act is prohibited or is made or declared to be unlawful or an offense, or whenever in this Code or any ordinance the doing of any act is required or the failure to do any act is declared to be unlawful, where no specific penalty is provided therefor, the penalty shall be classified as a Class B misdemeanor." § 1-11(a). Therefore, a violation of § 4-89 is a Class B misdemeanor. Olson Aff'd at ¶ 26.

Once a citation is issued, the defendant must make their initial appearance in municipal court. Olson Aff'd at ¶ 5. Williston's municipal court judge is elected by the public and licensed to practice law as required by North Dakota law[35]. At or before the defendant's initial appearance, they are provided a form advising them of all their rights. Olson Aff'd at ¶ 8; Exhibit # 1. Pursuant to North Dakota law, a matter may be transferred from municipal court "to district court for trial if within twenty-eight days after arraignment the defendant has requested in writing to transfer the case to district court and to exercise the defendant's right to a jury trial." N.D.C.C. § 40-18-15.1. If the defendant elects not to transfer his or her case to district court, a trial occurs before the municipal judge. N.D.C.C. § 40-18-15. However, if the defendant elects to transfer the case, it will be tried before a jury in district court. N.D.C.C. § 40-18-15.1.

---

[35] N.D.C.C. §§ 40-15-01 provides that "[e]ach city operating under the commission system of government may choose to have a municipal judge who shall be elected." Further, N.D.C.C. 40-18-01 provides "[t]he municipal judge within a city having a population of five thousand or more must be licensed to practice law in this state…"). The Honorable Janet Zander is licensed to practice law in the State of North Dakota, has served as municipal judge since January 1, 1995 and was re-elected in the last election. See Olson Aff'd at ¶ 6; see also *https://www.ndcourts.gov/lawyers/03700* (accessed June 2, 2022); *https://results.sos.nd.gov/resultsSW.aspx?text=Race&type=CIALL&map=CTY&area=Williston&name=Williston&eid=302.* (accessed June 9, 2022).

A defendant can only be found guilty for violation of § 4-89 "only if the city proves beyond a reasonable doubt that [the defendant has] committed each and every element to of the offense[36]."  Olson Aff'd, Exhibit # 1 at ¶ 7.  North Dakota law defines "Element of an offense" as "(a) The forbidden conduct; (b) The attendant circumstances specified in the definition and grading of the offense; (c) The required culpability[37]; (d) Any required result; and (e) The nonexistence of a defense as to which there is evidence in the case sufficient to give rise to a reasonable doubt on the issue."  N.D.C.C. § 12.1-01.03(1).

The North Dakota Rules of Criminal Procedure govern the practice and procedure in all criminal proceedings "including prosecutions for violations of municipal ordinances." N.D.R.Crim.P. 1.  Therefore, an individual charged with violation of § 4-89 is provided all of the same process as any other criminal defendant in the State.

If the municipal judge determines the City proved its case beyond a reasonable doubt in municipal court, "a defendant may appeal as provided in section 40-18-19."  N.D.C.C. § 40-18-15.  Section 40-18-19 provides that an "appeal may be taken to the district court from a judgment of conviction…in municipal court" by perfecting an appeal in accordance with the North Dakota Rules of Criminal Procedure.  N.D.C.C. § 40-18-19.  "A perfected appeal to the district court transfers the action to such district court for a trial anew.  On all appeals from a determination in a municipal court, the district court shall take judicial notice of all of the ordinances of the city." Id.

If the defendant is unsatisfied with the district court's final decision (either on a direct transfer or appeal of the municipal judge's decision), the defendant may appeal that decision to the

---

[36] A class B misdemeanor is an "offense" under North Dakota law.  N.D.C.C. § 12.1-32-01(6).
[37] The required culpability for a violation of § 4-89 is "willfully".  See N.D.C.C. § 12.1-02-02(2).

North Dakota Supreme Court.   N.D.C.C. § 29-01-12. Under North Dakota law, a defendant

charged with a violation of a municipal ordinance is entitled to substantial process.  This is far in

excess of the minimum required by the Constitution.  See  Hodel v. Virginia Surface Min. and

Reclamation Ass'n. Inc., 452 U.S. 264, 266 (1981) (holding the "deprivation of a significant

property interest without a prior hearing is justified when…it responds to situations in which swift

action is necessary to protect public health and safety" and due process is not violated when there

is a "a prompt and adequate postdeprivation administrative hearing and an opportunity for judicial

review.")

There is no level of the proceedings in which § 4-89 violates procedural due process.  The

initial authorized seizure of a dog is only the deprivation of property.  As the United States District

Court of Iowa recently recognized that Eighth Circuit precedent set forth the following:

> [T]he *Lunon* decision counsels that a pit bull dog owner's interest is relatively
> modest, while a municipality's interest in protecting its citizens' health, safety, and
> welfare from dangerous animals is so substantial that dogs are "'subject to the
> police power of the state, and might be destroyed or otherwise dealt with, as in the
> judgment of the legislature is necessary for the protection of its citizens.'" *Lunon*,
> 946 F.3d at 430 (quoting *Sentell*, 166 U.S. at 704, 17 S.Ct. 693). Similarly, the risk
> of an erroneous deprivation of the property interest in a pit bull is the destruction
> of the dog, but the governmental interest plainly permits that result. *Id.*

Danker v. City of Council Bluffs, Iowa, 2021 WL 5326409, at *13 (S.D. Iowa Oct. 29, 2021)[38].

With respect to the initial seizure and impoundment of a suspected pit bull dog, "mere

postponement of the judicial enquiry is not a denial of due process, if the opportunity given for

ultimate judicial determination of liability is adequate." Mickelson, 823 F.3d at 928 (8th Cir. 2016)

(quoting  Mitchell, 416 U.S. at 611 (1974)).  In other words, with respect to the impoundment of

---

[38] Danker is currently on appeal in the Eighth Circuit as No. 21-3794.  However, the issue of
procedural due process is not subject of that appeal.  Appellate Case: 21-3794 Entry ID: 5132719
(Appellants' Brief) at p. 16.

property (i.e. pit bulls) due process is not violated as long as "there is at some stage an opportunity for a hearing and a judicial determination." Ewing, 329 U.S. at 599. Article VI of the City Ordinances does not provide for any other penalty until after the dog owner is convicted of the offense. Williston City Ordinance at § 4-90(a)(12). The City Ordinance in conjunction with North Dakota law provides the dog owner with the right to a jury trial, and multiple avenues of appeal. Put simply, if a pit bull owner believes the City erred in charging them with a violation of § 4-89, they have multiple opportunities to establish the City failed to prove its case. There are no grounds upon which this process can violate procedural due process and summary judgment must be granted in the City's favor.

**IV. CONCLUSION**

For the aforementioned reasons, the City's motion for summary judgment should be granted.

Dated this 10th day of June, 2022.

SMITH PORSBORG SCHWEIGERT
ARMSTRONG MOLDENHAUER & SMITH

By  /s/ Brian D. Schmidt
      Brian D. Schmidt (ND Bar ID #07498)
      bschmidt@smithporsborg.com
      Scott K. Porsborg (ND Bar ID #04904)
      sporsborg@smithporsborg.com
      122 East Broadway Avenue
      P.O. Box 460
      Bismarck, ND 58502-0460
      (701) 258-0630

      Attorneys for Defendant, The City of
      Williston, North Dakota

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 10th day of June, 2022, a true and correct copy of the foregoing **DEFENDANT, CITY OF WILLISTON'S, MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT** was filed electronically with the Clerk of Court through ECF, and that ECF will send a Notice of Electronic Filing (NEF) to the following:

V. Gene Summerlin                    gene.summerlin@huschblackwell.com
Ryann A. Glenn                        ryann.glenn@huschblackwell.com
Amanda L. Wall                       amanda.wall@huschblackwell.com
Sydney L. Hayes                      sydney.hayes@huschblackwell.com
Attorneys at Law
13330 California St., Suite 200
Omaha, NE 68154


                                    By  /s/ Brian D. Schmidt
                                        BRIAN D. SCHMIDT