## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NORTH DAKOTA

BRANDY SUCKLEY, REANNAN
SUCKLEY, JYL ALBERTSON, LYNETTE
COLE-PEREA, MANUEL PEREA, and
EMILY HOLLY,

Plaintiffs,

v.

THE CITY OF WILLISTON, NORTH DAKOTA,

Defendant.

Case No. 21-cv-00012-CRH

---

### FIRST AMENDED COMPLAINT

Plaintiffs Brandy Suckley, Reannan Suckley, Jyl Albertson, Lynette Cole-Perea, Manuel

Perea and Emily Holly (collectively, "Plaintiffs"), for their First Amended Complaint against the

Defendant, state and allege as follows:

### INTRODUCTION

1.       This is a civil rights action for declaratory and injunctive relief arising under 42

U.S.C. §§ 1983 and 1988, 28 U.S.C. § 2201, 42 U.S.C. § 12131 *et seq.,* and the laws of the State

of North Dakota.  This action stems from Defendant's violations of Plaintiffs' rights under the

United States Constitution and the Americans with Disabilities Act ("ADA"), Title II, arising from

Defendant's enforcement of a ban on certain breeds of dogs in Williston, North Dakota.

### **Williston's Pit Bull Ban**

2.       The City of Williston, North Dakota (the "City") adopted a Pit Bull Ban, now

codified at Williston Ordinance Article VI § 4-89 (the "Pit Bull Ban" or "Ordinance") and titled

"Pit bull dogs; keeping prohibited," which prohibits keeping, harboring or owning or in any way

possessing "any dog which has the appearance and characteristics of being predominantly of the

1

breeds of bull terrier, Staffordshire bull terrier, American pit bull terrier, American Staffordshire terrier, any other breed commonly known as pit bulls, pit bull dogs or pit bull terriers, or a combination of any of these breeds." WILLISTON, NORTH DAKOTA, ORDINANCE ARTICLE § 4-89(f).

3.      Upon information and belief, the City adopted the Pit Bull Ban in an effort to remove dangerous dogs from the city limits of Williston and/or reduce the number of dog bites within the city limits of Williston.

4.      At all relevant times since the Pit Bull Ban became effective, it has been the pattern, practice and custom of the City of Williston and its officers, agents, and employees to enforce the Pit Bull Ban as written since its inception.

5.      The Pit Bull Ban authorizes the City to immediately seize, impound and remove from the City any dog it deems subject to the Pit Bull Ban and provides that any person who violates the Pit Bull Ban may be subject to a criminal Class B misdemeanor with a fine of up to $500.00 and up to thirty days imprisonment. Each day that a violation is permitted to exist constitutes a separate offense. *See* WILLISTON, NORTH DAKOTA, ORDINANCE ARTICLE §§ 1-11(a); 4-90(11) and (12).

6.      Defendant has enforced or threatened enforcement of the Pit Bull Ban against Plaintiff Reannan Suckley's dog, Duchess, Plaintiff Jyl Albertson's dog, Gunner, Plaintiffs Lynette Cole-Perea and Manuel Perea's dog, Raw-Koe, and Plaintiff Emily Holly's dog, Capone, and may imminently enforce the Pit Bull Ban against all Plaintiffs' current dogs.

7.      As a result of the actual enforcement of the Pit Bull Ban, Plaintiff Reannan Suckley's dog was impounded.

8.      As a result of the actual enforcement of the Pit Bull Ban, Plaintiff Jyl Albertson was required to relinquish possession and relocate her dog outside of Williston's city limits.

9.      As a result of the threatened enforcement of the Pit Bull Ban, Plaintiffs Lynette Cole-Perea and Manuel Perea were required to relocate their dog outside of Williston's city limits for an extended period of time.

10.      As a result of the actual enforcement of the Pit Bull Ban, on January 25, 2021, Plaintiff Emily Holly was informed that she had 10 days to remove her dog from the Williston city limits. Holly was also informed that the City or its agents could search her home to ensure that her dog had been removed.

11.      As a result of the potential enforcement of the Pit Bull Ban and Plaintiffs' reasonable fear of enforcement of the Pit Bull Ban, Plaintiffs are concerned that their current dogs may similarly be subject to impoundment under the Pit Bull Ban.

12.      Removing a dog from its home and the people with whom the dog has bonded and placing the animal in a kennel or other unfamiliar environment has adverse consequences on the animal, including increased cortisol levels and a clinical condition referred to as separation anxiety. The longer a dog remains in a kennel environment, the more likely it is that some of the physical and emotional changes in the dog may be permanent.

13.      The Pit Bull Ban has thereby deprived Plaintiffs of the comfort, companionship, and sense of security that their dogs provide them and subjected Plaintiffs to a reasonable concern that their property may be destroyed and euthanized under the Pit Bull Ban.  The Pit Bull Ban has further subjected Plaintiffs to a reasonable concern that they may be charged with civil or criminal violations if they bring their dogs back to Williston and that their homes may be searched by the City or its agents.

**Pit Bull Service Animal Exception**

14.     The City adopted an exception to the Pit Bull Ban, now codified in Williston

Ordinance Article VI § 4-90 ("Pit Bull Service Animal Exception") and titled "Keeping of

registered pit bulls," which requires individuals with service animals that fall under the Pit Bull

Ban to register the animal with the City and comply with additional standards in order to keep or

harbor the dog, including the following:

- <u>Leash and muzzle requirements</u>: Pit bull service dogs outside the animal's kennel must be muzzled and securely leashed with a leash no longer than four feet in length;

- <u>Confinement</u>: Pit bull service dogs shall be securely confined indoors or in a securely enclosed and locked pen or kennel that must be locked with a key or combination lock when the pit bull service dog is in the structure;

- <u>Confinement indoors</u>: Pit bull service dogs may not be kept on a porch or patio and may not be kept in a house when the windows are open or when screen windows or screen doors are the only obstacle preventing the dog from exiting the home;

- <u>Signs</u>: Owners of pit bull service dogs must display in a prominent place on their premises a sign easily readable by the public using the words "Beware of Dog;"

- <u>Insurance</u>: Owners of pit bull service dogs must provide proof to the City auditor of public liability insurance in a single incident amount of $50,000 for bodily injury or death or for damage to property caused by a pit bull service dog and such insurance policy must provide that no cancellation of the policy will be made without first giving 10 days written notice to the City auditor;

- <u>Identification photographs</u>: Owners of pit bull service dogs must provide to the City auditor two color photographs of the pit bull service dog clearly showing the color and approximate size of the dog; and

- <u>Reporting requirements</u>: Owners of pit bull service dogs must report the removal of the pit bull service dog from the City, death of the pit bull service dog, birth of offspring of the pit bull service dog, and new address if the owner should move within City limits.

WILLISTON, NORTH DAKOTA, ORDINANCE ARTICLE § 4-90(a).

15.     The additional standards set forth in the Pit Bull Service Animal Exception are only

required for pit bull service animals; they are not required for service animals of other breeds.

4

16.     At all relevant times since the Pit Bull Service Animal Exception became effective, it has been the policy, pattern, practice, and custom of the City of Williston and its officers, agents, and employees to cite owners of pit bull service dogs who do not register and comply with the standards of Williston Ordinance Article VI § 4-90 for a violation of the Pit Bull Ban under Williston Ordinance Article VI § 4-89.

17.     Plaintiff Reannan Suckley is a disabled individual who requires the assistance of her service dog, Duchess. Duchess is trained to perform tasks to assist Reannan with her disability.

18.      Plaintiff Manuel Perea is a disabled individual who requires the assistance of his service dog, Raw-Koe. Raw-Koe performs tasks to assist Manuel with his disability.

19.     The Pit Bull Service Animal Exception has subjected Plaintiffs with pit bull service animals to discrimination by requiring them to adhere to burdensome registration requirements and standards based on their choice of service animal.

## JURISDICTION AND VENUE

20.     This action arises under 42 U.S.C. § 1983 to redress the deprivation under color of state law of rights, privileges and immunities secured by the Constitution of the United States and other federal statutes.

21.     This Court has federal question jurisdiction over this controversy under 28 U.S.C. §§ 1331 and 1343.  This Court has jurisdiction over the request for declaratory relief pursuant to 28 U.S.C. §§ 2201 and 2202.

22.     Venue is proper in the District of North Dakota under 28 U.S.C. § 1391(b)(1) & (2).  The Defendant is a city located in this Judicial District and a substantial part of the events or omissions giving rise to the claim occurred in this Judicial District.

## PARTIES

23.     Plaintiff Brandy Suckley is an individual who has resided in Williston, North Dakota at all relevant times related to the enforcement of the Pit Bull Ban against Reannan's dog, Duchess, as alleged in this Complaint.

24.     Plaintiff Reannan Suckley is an individual who has resided in Williston, North Dakota at all relevant times related to the enforcement of the Pit Bull Ban against Reannan's dog, Duchess, as alleged in this Complaint. Reannan Suckley is an individual with a disability as defined under the ADA.

25.     Plaintiff Jyl Albertson is an individual who has resided in Williston, North Dakota at all relevant times related to the enforcement of the Pit Bull Ban against Jyl's dog, Gunner, as alleged in this Complaint.

26.     Plaintiffs Lynette Cole-Perea and Manuel Perea are individuals who have resided in Williston, North Dakota at all relevant times related to the threatened enforcement of the Pit Bull Ban against their dog, Raw-Koe, as alleged in this Complaint. Manuel Perea is an individual with a disability as defined under the ADA.

27.     Plaintiff Emily Holly is an individual who has resided in Williston, North Dakota at all relevant times related to the enforcement of the Pit Bull Ban against her dog, Capone, as alleged in this Complaint.

28.     Defendant City of Williston, North Dakota is a municipality for purposes of liability under 42 U.S.C. § 1983 and is located within the geographic area comprising the District of North Dakota.

29.     Defendant City of Williston, North Dakota and those City employees acting under its direction and control are hereinafter referred to as the "City."

30.     At all relevant times, it has been the pattern, practice and custom of the City to enforce the Pit Bull Ban against dogs and dog owners located within the Williston city limits.

## FACTUAL ALLEGATIONS

### Reannan Suckley's Dog, Duchess

31.     Brandy Suckley ("Brandy") obtained Duchess from a breeder as a puppy for her adult daughter, Reannan Suckley ("Reannan"). Duchess is a purebred American Bully (seventh generation pedigree).

32.     Duchess has never bitten or harmed any person, threatened harm toward any person, or acted aggressively toward any person.

33.     Brandy has lived in Williston for six years, both inside and outside the city limits. Reannan lived outside the city limits of Williston until recently. She currently resides in Williston's city limits.

34.     Before moving inside Williston city limits, Reannan was often inside Williston city limits to visit her mom, Brandy, and to assist Brandy with childcare for Brandy's younger children.

35.     When Reannan was inside Williston city limits providing care for Brandy's children, her puppy Duchess inadvertently got loose and was taken to the police station.

36.     Even though Reannan showed proof she lives outside of the city limits she was charged with a Class B misdemeanor and Duchess was impounded.

37.     Duchess remained impounded for six (6) weeks and was 14 weeks old when she was released. When Reannan got Duchess back, she had hot spots on all four legs, bloody stool, was extremely skinny, and had Giardia (parasites in her intestines).  The vet told Reannan dogs get Giardia from fecal matter being in the same place where they eat and drink water.

38.     Reannan was told the City could not release Duchess after Reannan's first court date because they were waiting for a DNA test to come back even though Reannan showed paperwork showing Duchess was not a pit bull.  The test took three (3) weeks to come back.

39.     An animal control officer told Reannan the results of the DNA test showed Duchess is an American Staffordshire Terrier, however a DNA test performed by Duchess' veterinarian showed Duchess as 100% American Bully and Duchess' pedigree has been verified by the breeder.

40.     Reannan retained counsel and pled guilty to a lesser charge.  She was required to sign a consent for a search of any residence she resides in within the city limits. Additionally, she was fined $350.00, which Brandy paid for her.

41.     Before moving inside Williston city limits, Reannan would visit Brandy or assist Brandy with childcare, and bring Duchess to Brandy's home.

42.     On or around December 7, 2020, animal control visited Brandy's house saying someone had given them pictures of a pit bull at the residence.  A babysitter was home at the time with Brandy's children and would not permit them to enter.

43.      If it were not for the Pit Bull Ban, Reannan and Brandy would be able to live without fear that Duchess will be taken from Reannan by Animal Control under the Williston Ordinance and that either Reannan or Brandy will be charged under the Ordinance.

44.     Duchess has now been trained at Ambush Training Kennels in Minot, North Dakota for service dog/support dog training.  Duchess performs tasks as a service animal for Reannan, who is a disabled individual under the ADA.

45.     Duchess has not been registered as a pit bull with the city of Williston under the Pit Bull Service Animal Exception due to the burden of the additional standards required for pit bull service animals.

### **Jyl Albertson's dog, Gunner**

46.     Jyl Albertson ("Jyl") is a teacher in Williston and resides with her boyfriend in Williston during the school year and in Georgia other times of the year. Jyl has lived in Williston for the past two school years and previously lived in Williston full time from 2003-2011 but lived outside of the city limits.  Gunner, who is a mixed breed dog, is over eleven years old.  Jyl rescued him from a shelter in Williston when he was a puppy.

47.     Gunner has never bitten or harmed any person, threatened harm toward any person, or acted aggressively toward any person.

48.     Gunner was in the vehicle with Jyl when she was pulled over for a traffic infraction and Jyl was cited for having a pit bull within the city limits.

49.     After being told by Taylor Olson, the City Attorney, that there would not be a hearing due to COVID-19 restrictions, and that she was guilty and there was no way to fight the charges, Jyl signed a plea agreement to a Class B misdemeanor, a $350.00 fine, one year probation, and consent to search her boyfriend's residence at any time.

50.     Further, Jyl was told if she did not relocate Gunner outside the city limits within seven (7) days, she would be placed in jail and Gunner would be confiscated and impounded.

51.     Jyl was forced to relocate Gunner to her son in Georgia.

52.     If the Pit Bull Ban were repealed, Jyl would bring Gunner back to Williston.

### **Lynette Cole-Perea and Manuel Perea's dog, Raw-Koe**

53.     Lynette Cole-Perea and Manual Perea (the "Pereas") have lived in Williston for five years.  Raw-Koe is a three-year-old purebred American Staffordshire Terrier.  The Pereas have had Raw-Koe since he was abandoned as a puppy.

54.     Raw-Koe has never bitten or harmed any person, threatened harm toward any person, or acted aggressively toward any person.

55.     Police and Animal Control came to the Pereas' home in November 2018.  When Manuel Perea opened the door, the police officer asked whether they were harboring a Pit Bull.

56.     The Pereas immediately re-homed Raw-Koe to their daughter's home in Denver, Colorado, because they feared enforcement of the Pit Bull Ban.

57.     Due to a medical condition, Manuel Perea did not respond well to being separated from Raw-Koe.  The Pereas brought Raw-Koe back to Williston in the Summer of 2020 and Raw-Koe was certified as a service animal for Mr. Perea.

58.     The Pereas have noticed police are patrolling the area around their home more often since Raw-Koe has returned, causing the Pereas to feel intimidated and fearful that Raw-Koe could be taken from them at any time.

59.     If not for the Pit Bull Ban, the Pereas could live in Williston without constant fear that Raw-Koe will be taken from them.

60.     Raw-Koe performs tasks as a service animal for Manuel Perea, who is a disabled individual under the ADA.

61.     Raw-Koe has not been registered as a pit bull with the city of Williston under the Pit Bull Service Animal Exception due to the burden of the additional standards required for pit bull service animals.

**Emily Holly's dog, Capone**

62.     Emily Holly ("Emily") has lived in Williston or outside the city limits of Williston since 2012.  Capone is a twelve-year-old American Bulldog.  Emily has had Capone since he was a puppy when she got him from a breeder.

63.     Capone has never bitten or harmed any person, threatened harm toward any person, or acted aggressively toward any person.

64.     Police and Animal Control came to Emily's home due to a tip that she has a pit bull.  Emily informed them Capone is American Bulldog, however the Animal Control Officer stated Capone has characteristics of a pit bull.

65.     Emily was issued a citation, fined $350.00, informed that she must remove Capone from the city limits of Williston by February 4, 2021, and that her home may be subject to search to ensure that Capone has been removed from the City limits.

66.     If not for the Pit Bull Ban, Emily would not be required to relocate Capone outside the city limits.

**UNRELIABILITY OF VISUAL BREED IDENTIFICATION OF MIXED BREED DOGS**

67.     Over the past decade, the understanding of the canine genome has increased greatly. Through scientific study, it is now possible to determine breed composition of dogs through DNA analysis.

68.     Study of the canine genome has also resulted in the development of gene markers which identify those genes related to physical appearance.  There are approximately 20,000 protein coding genes in the canine genome.  Of these, fewer than 1% control the external morphological features associated with the physical appearance attributed to specific breeds of dogs (e.g., ear shape and size, length of legs, length of coat, coat color, color pattern, shape of head, body size and type, and length of muzzle).

69.     Due to the manner in which genes combine when dogs of different breeds are mated, mixed breed dogs commonly express physical traits and characteristics that are unrelated to their actual primary breed composition as determined by DNA testing.

70.     Due to those same genetic combination factors referenced above, mixed-breed dogs often do not express the physical traits and characteristics that are commonly associated with the breeds that do make up their actual primary breed composition as determined by DNA testing.

71.     Even purebred dogs bred together can have offspring that look different than its parents, even to the extent of no longer matching the AKC standards for that purebred dog.

72.     As a result, scientific studies have determined that even people with training in identifying dog breeds are wrong more often than not in determining the primary breed of a mixed-breed dog based on visual analysis when compared to the animal's actual primary breed composition as determined by DNA testing.

73.     According to a manual published by the National Animal Control Association ("NACA"), visual identification of heritage of a mixed-breed dog is nearly impossible.

74.     The NACA manual advises that AKC breed standards only provide "the ideal example" of the breed, and that many dogs which do not pass the ideal standards "are sold as 'pet quality' dogs."  The NACA manual also states that "Animal Control Officers don't often come face-to-face with ideal representatives of the various breeds," and that many dogs bred unconventionally may "bear little more than a faint resemblance to the breed standard."

75.     There are more than twenty breeds of dogs commonly misidentified as pit bulls.

**UNRELIABILITY OF BREED AS A PREDICTOR OF DANGEROUSNESS**

76.     Although media and news outlets commonly report that certain breeds of dogs are thought to be a greater risk to bite humans than other breeds of dogs, there is no scientific or epidemiological basis for these statements.

77.     Supposed scientific conclusions made even as recently as 2005 regarding the efficacy of breed bans are now outdated due to a significant advancement in knowledge regarding dog behavior and genetics.

78.     Most non-scientific claims that assert certain breeds pose a greater risk of dangerousness to humans rely on a twenty-year-old study conducted by individual investigators from the Centers for Disease Control and Prevention ("CDC'), the Humane Society of the United States ("HSUS"), and the American Veterinary Medical Association ("AVMA") (*See* Sacks, Jeffrey J., Leslie Sinclair, Julie Gilchrist, Gail C. Golab, and Randall Lockwood. "Breeds of Dogs Involved in Fatal Human Attacks in the United States between 1979 and 1998." *Journal of the American Veterinary Medical Association* 217.6 (2000): 836-40) ("AVMA Article")).

79.     In response to the non-scientific claims that the AVMA Article concluded that certain breeds of dogs were more dangerous than other breeds of dogs, the AVMA issued the following statement:

> In contrast to what has been reported in the news media, the data contained within this report **CANNOT be used to infer any breed-specific risk** for dog bite fatalities (e.g., neither pit bull-type dogs nor Rottweilers can be said to be more "dangerous" than any other breed based on the contents of this report). To obtain such risk information it would be necessary to know the numbers of each breed currently residing in the United States. Such information is not available.
>
> Data in this report indicate that the number of dogs of a given breed associated with fatal human attacks varies over time, further suggesting that such data should not be used to support the inherent "dangerousness" of any particular breed. More than 25 breeds have been involved in fatal human attacks over the 20-year period summarized in this report.

(emphasis in original)

13

80.     The AVMA further stated, "Statistics on fatalities and injuries caused by dogs cannot be responsibly used to document the 'dangerousness' of a particular breed, relative to other breeds, for several reasons."

81.     The CDC responded to the non-scientific use of the AVMA Article by warning that the study "does not identify specific breeds that are most likely to bite or kill, and thus is not appropriate for policy-making decisions related to the topic."

82.     HSUS responded to the use of the AVMA Article to support breed-specific bans with a statement that "There is no evidence that breed-specific laws reduce dog bites or attacks on people, and they divert resources from more effective animal control and public safety initiatives. . . . Breed-based policies aren't founded on science or credible data, but on myths and misinformation surrounding different breeds."

83.     Scientific studies have demonstrated that there is nothing inherently different about pit bull dogs that set them apart from other dogs in terms of behavior.

84.     Pit bulls do not have unusual strength for their size, nor do they have a different jaw size or any jaw "locking" mechanism.

85.     The genes influencing behavioral traits such as aggression in mammals are not yet known, despite large scale studies seeking them in human research.

86.     Today, behavioral traits are believed to be highly polygenic, meaning they are influenced by many, many genes, each with very small effect size.

87.     These genes are also believed to be epistatic, meaning that they interact with each other in highly unpredictable ways – a particular version of gene A may have one effect when present with a particular version of gene B, but may have the opposite effect when present with a different version of gene B (or a particular version of gene C).  Epistasis is one of the reasons why

reliably controlling behavioral characteristics by selective breeding is difficult: a version of a gene having one effect in a parent animal may have the opposite effect in offspring, when expressed against a different genetic background.

88.     For all of these reasons, genetics are not highly predictive of behavior in dogs. Environmental influences, such as appropriate early socialization and maintenance in the home as a family dog, are more predictive of a dog's behavioral traits than its genetics.

89.     Breed bans are not a rational approach to addressing the public health concerns of dog bites.

### OPERATION OF THE WILLISTON PIT BULL BAN

90.     For mixed-breed dogs, the Williston Pit Bull Ban relies on visual identification to determine whether an animal displays "the appearance or characteristics of being predominantly of the breeds of bull terrier, Staffordshire bull terrier, American pit bull terrier, American Staffordshire terrier, any other breed commonly known as pit bulls, pit bull dogs or pit bull terriers, or a combination of any of these breeds."

91.     Upon information and belief, Williston's animal control makes subjective determinations as to whether a dog is a pit bull or has the "appearance or characteristics" of a pit bull based on their visual inspection of the dog.

92.     Due to the Pit Bull Ban's reliance on visual breed identification for mixed-breed dogs, more often than not:

   a.     Mixed-breed dogs will be visually identified as predominantly Staffordshire Bull Terrier, American Pit Bull Terrier or American Staffordshire Terrier, though none of these breeds will, in fact, be the predominant breed of the animal; and

   b. Mixed-breed dogs will not be visually identified as predominantly Staffordshire Bull Terrier, American Pit Bull Terrier or American Staffordshire Terrier, though one or more of these breeds will, in fact, be the predominant breed of the animal.

  93. As the City may take virtually any dog under guise of the Pit Bull Ban, regardless of official documentation or DNA tests showing the dog is not a pit bull, an ordinary citizen cannot know whether their dog—particularly if it is a mixed-breed dog—is subject to the Ordinance.

  94. The Pit Bull Ban results in a scenario wherein whether any particular citizen's dog is subject to the Pit Bull Ban can often depend on the moment-to-moment judgment of a City officer on their patrol.

  95. Approximately one-half of the 80 million dogs in the United States are mixed-breed dogs.

  96. Upon information and belief, one-half of the dogs in Williston are mixed-breed dogs.

  97. Statistically, for the mixed-breed dog population of Williston, the Pit Bull Ban will misclassify more than one-half of all mixed-breed dogs and ban dogs that should not be banned under the Pit Bull Ban and fail to ban dogs that the Pit Bull Ban requires be banned.

  98. Upon information and belief, Williston has no evidence of the effectiveness of the Pit Bull Ban.

**CLAIM FOR RELIEF**
**Violation of the United States Constitution**
**(42 U.S.C. § 1983)**

  99. Plaintiff incorporates the allegations contained in Paragraphs 1 through 98 as if realleged in this paragraph.

  100. The Pit Bull Ban is unconstitutionally vague because it fails to provide fair warning of exactly what actions and what animals are prohibited by the Pit Bull Ban:

16

a.      The Pit Bull Ban's identification of the animals subject to the ban are overly vague and lack sufficient definiteness and specificity to inform those who may be subject to the law to avoid violating the law or to provide persons of ordinary intelligence a reasonable opportunity to know what specific animals are prohibited by the Pit Bull Ban; and

b.      The definitions of the animals banned by the Pit Bull Ban allow for arbitrary, inconsistent, and discriminatory enforcement by Defendant.

101.    Upon information and belief, Defendant has enforced and continues to enforce the Pit Bull Ban in an arbitrary, inconsistent, and discriminatory manner.

102.    The Pit Bull Ban is overinclusive as a safety regulation because it bans animals that do not pose a risk of harm to others.

103.    The Pit Bull Ban is underinclusive as a safety regulation because it fails to ban animals that do pose a risk of harm to others.

104.    By deeming all predominantly Staffordshire Bull Terrier, American Pit Bull Terrier or American Staffordshire Terrier dogs as dangerous, the Pit Bull Ban bears no rational relationship to any legitimate state interest in health, safety or welfare and violates Plaintiffs' substantive due process rights.

105.    The Pit Bull Ban's disparate classification and treatment of owners of predominantly Staffordshire Bull Terrier, American Pit Bull Terrier or American Staffordshire Terrier dogs from owners of all other breeds of dogs bears no rational relationship to any legitimate state interest and violates the Equal Protection rights of Plaintiffs as guaranteed by the Constitution.

106.    Under North Dakota law, Plaintiffs have a protectable property interest in their dogs and in their money.

107.    The Pit Bull Ban authorizes Defendant to immediately impound any dog found at large and prohibits the keeping of "pit bull" dogs within the City. *See* WILLISTON, NORTH DAKOTA, ORDINANCE ARTICLE §§ 4-89; 4-90(11).

108.    The Ordinance provides no opportunity for a dog owner to challenge the determination that their dog is a "pit bull" under the Ordinance.

109.    The Ordinance does not provide dog owners a meaningful opportunity to respond to allegations against them.

110.    The Ordinance does not specify any burden of proof for the determination that a dog is a prohibited pit bull.

111.    The Ordinance does not provide for any further appeal or review of a decision that a dog is a prohibited pit bull.

112.    The Ordinance imposes no time limits on how long Animal Control may impound a dog before determining it to be a prohibited pit bull.

113.    The Pit Bull Ban provides no mechanism for an owner to receive an official breed determination before the dog is seized.

114.    The Pit Bull Ban does not contain any provision requiring the City to return impoundment fees to a prevailing owner whose dog was wrongfully impounded.

115.    The threat of indefinite impoundment and associated fees dissuade affected dog owners from exercising their due process rights.

116.    All of the above actions and omissions are the official policies, practices and customs of the Defendant.

117.    The official policies, practices and customs of the Defendant as described above violate the Due Process Clause of the Fourteenth Amendment to the United States Constitution

and the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.

**Violation of Title II of the Americans with Disabilities Act**
**(42 U.S.C. § 12131, *et seq*.)**

118.    Plaintiff incorporates the allegations contained in Paragraphs 1 through 117 as if realleged in this paragraph.

119.    The City is a public entity as a local government, acting through its City Council and City Attorney.

120.    Plaintiffs Manuel Perea and Reannan Suckley are disabled individuals who require the assistance of their service dogs, Duchess and Raw-Koe.

121.    Duchess and Raw-Koe are housebroken, animals that have never bitten or harmed any person, threatened harm toward any person, or acted aggressively toward any person.

122.    Plaintiffs Manuel Perea and Reannan Suckley have standing to bring this action under the Americans with Disabilities Act because the City's policies found in the Pit Bull Service Animal Exception have subjected the Plaintiffs to discrimination based on their disabilities.

123.    The City has a city ordinance that prohibits pit bulls and requires a disabled individual to obtain registration for pit bull service animals.

124.    The Pit Bull Service Animal Exception imposes additional burdensome restrictions and standards on service animals and their disabled owners if the service animal is a pit bull.

125.    The burdensome restrictions and standards include leash and muzzle requirements, confinement limitations, signage display, proof of insurance, identification photographs, reporting requirements, and sale and ownership transfer limitations.

126.    Failure to comply with the registration and standards of the Pit Bull Service Animal Exception may result in the service animal's seizure and impoundment as well as penalties to the disabled individual including fines and imprisonment.

127.    The City is discriminating against Plaintiffs Manuel Perea and Reannan Suckley by requiring registration and compliance of the burdensome standards based on their choice of service animal being a pit bull.

128.    Plaintiffs Manuel Perea and Reannan Suckley have experienced considerable emotional distress as a result of the City's discrimination. Plaintiffs Manuel Perea and Reannan Suckley live in constant fear that their service dogs will be removed.

129.    The official policies, practices and customs of the City as described above violate Title II of the Americans with Disabilities Act and constitute an impermissible discriminatory practice because it fails to reasonably accommodate disabled individuals' use of service animals.

WHEREFORE, Plaintiffs respectfully requests that this Court:

1.    Enter judgment declaring that the Pit Bull Ban and related policies, practices, and customs of the Defendant violates the Fourteenth Amendment to the United States Constitution and may not lawfully be enforced in the future;

2.    Enter judgment declaring that the Pit Bull Animal Exception and related policies, practices, and customs of the Defendant have subjected Plaintiffs to discrimination in violation of Title II of the American with Disabilities Act and may not lawfully be enforced in the future;

3.    Issue preliminary and permanent injunctions prohibiting the Defendant, their employees and agents, and all persons acting under its direction from enforcing the above referenced Pit Bull Ban, Pit Bull Animal Exception, policies, practices, and customs;

4.    Grant Plaintiffs reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988 and other applicable laws; and

5.    Grant all such other and further relief as this Court deems just and proper.

Dated this 10th day of November 2022

BRANDY SUCKLEY, REANNAN SUCKLEY, JYL ALBERTSON, LYNETTE COLE-PEREA, MANUAL PEREA, and EMILY HOLLY, Plaintiffs

BY:     */s/ V. Gene Summerlin*
        V. Gene Summerlin – NE #19611
        Ryann A. Glenn – NE # 26160; IA #AT0010530
        Amanda L. Wall – NE #26872
        Sydney L. Hayes – NE #27051
        HUSCH BLACKWELL LLP
        13330 California St., Suite 200
        Omaha, NE 68154
        (402) 964-5000
        (402) 964-5050 (fax)
        gene.summerlin@huschblackwell.com
        ryann.glenn@huschblackwell.com
        amanda.wall@huschblackwell.com
        sydney.hayes@huschblackwell.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 10th day of November 2022, I filed the foregoing document with the Clerk of Court using the CM/ECF system, causing notice of such filing to be served on all parties' counsel of record.

*/s/ V. Gene Summerlin*